UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THEODORA NIKOLAKOPOULOS,

                    Plaintiff,

            -v.-

MACY'S INC.; BLOOMINGDALE'S, INC.;
BLOOMINGDALE'S LLC; ANGELA
KOTSOVOLOS; ROSA DIFRANCO; APRIL
DITO; ALYSSA MIRZA; MARK MORROW; and
MONICA TONEY, *individually*,

                    Defendants.

20 Civ. 1641 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Theodora Nikolakopoulos brings this action against her former

employers, Macy's Inc., Bloomingdale's, Inc., and Bloomingdale's LLC

(collectively, "Bloomingdale's"),[1] and several of her coworkers, including Angela

Kotsovolos, Rosa DiFranco, April Dito, Allyssa Mirza, Mark Morrow, and

Monica Toney (the "Individual Defendants," and together with Bloomingdale's,

"Defendants").  Plaintiff claims that Defendants subjected her to

discrimination, retaliation, a hostile work environment, and interference, in

violation of several federal, state, and local statutes, including the Americans

with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101-12213; the Family

and Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601-2654; the New York

---

[1]     As explained in the following section, Plaintiff worked in the Bloomingdale's store
located on 59th Street in Manhattan.  (Dkt. #100 at ¶ 1).  Bloomingdale's LLC formerly
did business as Bloomingdale's, Inc., and Macy's is the ultimate parent company of
Bloomingdale's LLC.  (*Id.* at 4 n.3).  Plaintiff alleges in her Complaint that these
defendants were her joint employers, "with overlapping power to hire, fire, discipline,
supervise, compensate, and document [her]."  (Dkt. #3 at ¶ 16).

State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290-297; and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-131.

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the Court grants Defendants' motion in full as to Plaintiff's federal claims under the ADA and FMLA. The Court also grants Defendants' motion as to Plaintiff's claims for failure to accommodate under the NYSHRL and interference under the NYCHRL. Lastly, the Court declines to exercise supplemental jurisdiction over Plaintiff's surviving state and city claims under the NYSHRL and NYCHRL, and dismisses those claims without prejudice to their renewal in state court.

## BACKGROUND[2]

### A.   Factual Background

#### 1.   The Parties

On June 24, 2014, Plaintiff was hired to work as a tailor and fitter in the Alterations Department (the "Department") of Bloomingdale's at its retail store

---

[2]   The Court pauses to express its dissatisfaction with the parties' presentations of facts in this case. In their opening memorandum of law, Defendants state that "[t]he facts related to this matter are set forth in [their] Joint Statement of Undisputed Facts." (Def. Br. 2). This practice is expressly forbidden by Rule 5(c)(iv) of the Court's Individual Rules of Practice in Civil Cases, which provides that "[e]ach memoranda of law must include a statement of facts, and may not simply incorporate by reference the entirety of a party's 56.1 Statement." *Cf. Amnesty Am.* v. *Town of W. Hartford*, 288 F.3d 467, 470-71 (2d Cir. 2002) (explaining that "because nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations"). Relatedly, while Plaintiff does provide a statement of facts in her opposition brief (*see* Pl. Opp. 1-7), she makes habitual use of misleading quotation marks and repeatedly references statements and other purported facts throughout her memorandum of law that either lack a record citation or are, at best, summaries of the record evidence to which she purports to cite. These shortcomings in the parties' briefs required the Court to expend significant effort combing through the record to ensure

2

on 59th Street in Manhattan (the "Store").  (Def. 56.1 ¶ 1).  Plaintiff worked at

the Store until she was fired on January 16, 2020.  (*Id.* at ¶ 2).

Kotsovolos was a manager in the Department.  (Def. 56.1 ¶ 3).

Traditionally, the Department had separate managers for the women's and

men's departments.  (*Id.*).  Consistent with this usual practice, Kotsovolos

---

the accuracy of its presentation and analysis of the facts.  The Court expects both
parties to be more mindful of their obligations in all future cases.

That said, the facts set forth in this Opinion are drawn from the parties' submissions in
connection with Defendants' motion for summary judgment.  The Court draws primarily
from (i) Defendants' joint statement of undisputed material facts submitted pursuant to
Local Civil Rule 56.1 ("Def. 56.1" (Dkt. #100)); (ii) Plaintiff's counterstatement of
undisputed material facts ("Pl. 56.1" (Dkt. #112)); and (iii) Defendants' reply to Plaintiff's
counterstatement of facts ("Def. 56.1 Reply" (Dkt. #114)).  The Court also sources
additional facts from the declarations submitted by the parties and the exhibits
attached thereto, which declarations are cited using the convention "[Name] Decl."
These declarations and exhibits include Plaintiff's declaration submitted in opposition
to Defendants' motion and the transcript of Plaintiff's April 16, 2021 deposition
attached to her declaration ("Pl. Dep." (Dkt. #111-1)); the declaration of Allyssa Maison-
Mirza, who is named in the Amended Complaint as "Alyssa Mirza" and referred to in
Defendants' briefing as "Allyssa Mirza," submitted in support of Defendants' motion
(Dkt. #102); the declaration of Anita Watkins-Utsey submitted in support of Defendants'
motion (Dkt. #104); the declaration of April Dito submitted in support of Defendants'
motion (Dkt. #105); the declaration of Mark Morrow submitted in support of
Defendants' motion (Dkt. #107); the supplemental declaration of Mirza submitted in
support of Defendants' motion (Dkt. #115); and the supplemental declaration of Toney
submitted in support of Defendants' motion (Dkt. #120).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited
therein.  Where facts stated in a party's Rule 56.1 Statement are supported by
testimonial or documentary evidence, and denied with only a conclusory statement by
the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c)
("Each numbered paragraph in the statement of material facts set forth in the
statement required to be served by the moving party will be deemed to be admitted for
purposes of the motion unless specifically controverted by a corresponding numbered
paragraph in the statement required to be served by the opposing party.").  Additionally,
to the extent that either side purports to dispute facts in the other's Rule 56.1
Statement with inadmissible evidence or with evidence that does not support the
proposition for which it is advanced, the Court finds such facts to be true.  *See id.* at
56.1(d) ("Each statement by the movant or opponent ... controverting any statement of
material fact[ ] must be followed by citation to evidence which would be admissible, set
forth as required by Fed. R. Civ. P. 56(c).").

For ease of reference, the Court refers to Defendants' memorandum of law in support of
their motion for summary judgment as "Def. Br." (Dkt. #101); Plaintiff's memorandum
of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #110); and Defendants'
reply memorandum of law in further support of their motion as "Def. Reply" (Dkt. #113).

initially oversaw the women's department and another, unnamed manager oversaw the men's department.  (*Id.*; Pl. 56.1 ¶ 3).  In early 2016, however, the manager of the men's department left the Store, and Kotsovolos was selected to oversee both the women's and men's departments.  (*Id.* at ¶ 3; *see also* Morrow Decl. ¶ 3).  Kotsovolos served as one of Plaintiff's supervisors during this time. (*See* Def. 56.1 ¶ 6).  Kotsovolos continued serving as the manager of both departments until November 2019, when nonparty Natalia Surazhsky was selected to manage the men's department.  (*Id.*).  After Surazhsky's appointment, Kotsovolos returned to managing only the women's department and ceased exercising any supervisory authority over Plaintiff.  (*Id.*).

The remaining Individual Defendants worked in various capacities at the Store.  DiFranco was a tailor who, as of March 2019, served as a supervisor in the Department.  (Def. 56.1 ¶ 7).  Dito was a Human Resources ("HR") manager.  (*Id.* at ¶ 10).  Mirza was an Employee Relations Manager ("ERM") who worked with Plaintiff concerning any requested accommodations for medical restrictions and assisted Plaintiff in getting approvals for leaves of absence.  (*Id.* at ¶¶ 11, 12).  Morrow was the Senior Director for operations in the Bloomingdale's New York Trade Area, and served as Kotsovolos's supervisor during her time managing the Department.  (*Id.* at ¶ 14).  Toney was an advisor in the Macy's Accommodations, Disability and Leave Management Office, who handled accommodation requests from Plaintiff.  (*Id.* at ¶ 15).  In this role, Toney worked with Macy's and Bloomingdale's employees who had restrictions to ensure that they were given proper accommodations.  (*Id.* at ¶ 16).

### 2.    Plaintiff's Medical Leaves of Absence

Between 2016 and her release from the Store in 2020, Plaintiff experienced several medical issues that resulted in multiple leaves of absence. According to Bloomingdale's records, Plaintiff was on leave from (i) June 14, 2016, to July 6, 2016; (ii) May 19, 2017, to May 29, 2017; (iii) June 15, 2017, to July 17, 2017; (iv) April 5, 2018, to May 10, 2018; (v) February 21, 2019, to March 4, 2019; and (vi) April 6, 2019, to June 10, 2019. (Def. 56.1 ¶ 55). Additionally, Plaintiff learned on January 13, 2020, that she required surgery and would need to take another leave of absence. (Pl. 56.1 ¶ 164). Plaintiff submitted a request for leave to Surazhsky on that same date, but was fired before her request was processed. (*Id.*). With the exception of that final request, Plaintiff could not recall a leave of absence that she requested but that Bloomingdale's did not provide her. (Def. 56.1 ¶¶ 56, 60).[3]

While Plaintiff does not contest that she received leave each time that she requested it (*see* Pl. 56.1 ¶ 60), she takes issue with the specific form of leave that she was granted to visit her ailing mother in Greece (*id.* at ¶ 59). In particular, Plaintiff contends that Defendants "made her use unpaid leave," rather than her vacation days, "as a way of retaliating against her for requesting time off." (*Id.* (citing Pl. Decl. ¶ 3)). Plaintiff does not otherwise

---

[3]     Although Plaintiff testified at her deposition that she believed she was denied a leave of absence on one occasion, she "later testified that, in fact, she was not sure if a leave had been denied." (Def. 56.1 ¶ 57). Additionally, Plaintiff does not dispute Defendants' statement that "the records maintained by [Bloomingdale's] Employee Relations Managers do not show or evidence any leave that Plaintiff requested during her employment had been denied." (*See* Pl. 56.1 ¶ 56).

discuss the trip or identify the basis in the record for her claim that Defendants required her to use unpaid leave for the trip for retaliatory reasons.

### 3.    Plaintiff's Medical Restrictions and Accommodations

Plaintiff also received multiple workplace accommodations in connection with her health issues between 2016 and 2020.  As stated earlier, Plaintiff was initially hired as a tailor and fitter.  (Def. 56.1 ¶ 1).  In March 2016, however, Plaintiff reported to HR that her doctor had told her not to perform repetitive movements and that she would need an accommodation to address this limitation.  (*Id.* at ¶ 62).  Bloomingdale's accommodated Plaintiff by having her cease tailoring (which violated her restriction) and do only fittings (which did not).  (*Id.* at ¶ 63).  Similarly, in August 2016, Plaintiff was told that she would be responsible for performing quality control ("QC") work for the Department. (*Id.* at ¶ 70).[4]  In this role, Plaintiff had several responsibilities.  Most notably, Plaintiff was the final person to review a garment before it was picked up or shipped to the customer.  (*Id.* at ¶ 80).  If there was a problem with the alterations done to a garment, such as the alterations were incomplete or were completed incorrectly, Plaintiff was charged with flagging the issue and sending the garment back to the employee who had worked on it.  (*Id.*).  In addition, Plaintiff was required to do certain work on the computer.  (*See id.* at ¶ 81; Pl. 56.1 ¶ 81).  This work included inputting ticket numbers and tracking the

---

[4]    When Plaintiff later began to experience shoulder pain that limited her ability to perform the QC work, the HR department told her to cease performing the QC work and to return to doing fittings.  (Def. 56.1 ¶ 72).  Plaintiff was able to return to QC work in June 2017, and remained in that position until she was fired.  (*Id.* at ¶¶ 78-79, 82).

garments handled by the Department.  (*Id.*; *see also* Pl. Dep. 134:6-8 (Plaintiff testifying that she would "check the garments" — including "[t]he outgoing, the incoming garments, the fitting garments")).[5]  Plaintiff does not dispute that these accommodations fully addressed the medical issues that she was experiencing at the time.  (*See* Pl. 56.1 ¶¶ 66, 69, 86).

Plaintiff does contend, however, that she was denied several subsequent accommodations.  (*See* Pl. 56.1 ¶ 103).  More specifically, Plaintiff contends that she was offered three additional accommodations by Bloomingdale's, but did not receive the accommodations in practice due to the interference of Kotsovolos and certain other coworkers.  (*Id.*).  Plaintiff also asserts that several of her coworkers made rude or disparaging comments about the accommodations she received.  (*See, e.g.*, *id.* at ¶¶ 139, 143, 146).  These accommodations and comments are discussed in detail in below.

### a.    Breaks

Plaintiff first asserts that she was denied periodic breaks that she was directed to take to address pain she was experiencing in her left hand.  (*See* Def. 56.1 ¶ 73).  In November 2016, Plaintiff submitted a note from her doctor stating that she was permitted to "mark clothes, light hand sewing, no use of sewing machine; No heavy scissors, no cutting garments.  Patient requires

---

[5]     The parties' briefs reflect some disagreement as to the scope of Plaintiff's computer-related responsibilities.  (*Compare* Def. 56.1 ¶ 81, *with* Pl. 56.1 ¶ 81).  Specifically, Plaintiff disputes that she was required to perform certain "clerical work."  (*See* Pl. 56.1 ¶ 81).  Plaintiff does not, however, precisely define the term "clerical work," nor does she consistently differentiate between the work she admits to having done on the computer and the clerical work she denies being responsible for.  Because this distinction does not bear on the Court's legal analysis, it is not discussed further here.

frequent breaks 15 minutes every two hours.  Patient can continue to do fittings." (*Id.*; *see also* Mirza Decl., Ex. D at BLM000539 (copy of letter)).[6] Bloomingdale's accommodated Plaintiff by "empower[ing] her to take the breaks when she needed to in order to meet her restrictions."  (Def. 56.1 ¶ 74).

Although Plaintiff does not dispute that she was told she could take breaks as needed, she claims that "she could not take her breaks because of how much work she had and her co-workers would demand she work while she was taking a break."  (Pl. 56.1 ¶ 74).[7]  Plaintiff testified that when she would attempt to take her breaks, Kotsovolos would tell her: "[W]e cannot have you … stop every two hours to have the breaks.  You have to do this, you have to do that."  (Pl. Dep. 91:7-9).  Plaintiff concedes, however, that "[w]hile Kotsovolos might have inadvertently asked [her] to do something when she was thinking of taking a break, it was not intentional, nor was Kotsovolos attempting to interfere with Plaintiff taking her breaks."  (Pl. 56.1 ¶ 124).  Further, Plaintiff testified that she did not tell anyone in HR that she was unable to take her breaks because she "didn't want to have issues."  (Pl. Dep. 99:23-24).

### b.    Clothing Racks

Next, Plaintiff claims that she was denied an accommodation for the pain she was experiencing in her arm.  Plaintiff first notified Bloomingdale's of the

---

[6]     Exhibit D to Mirza's declaration includes each of the doctor's notes that Plaintiff submitted to Bloomingdale's over the course of her time at the Store.  Because these exhibits are not separately numbered or paginated, the Court cites to them using the corresponding Bates number.

[7]     Plaintiff also sources her inability to take breaks to the fact that the employee lounge was located far from her work area and she "did not want to use up so much of her break time going from her work area to the break room and back."  (Pl. 56.1 ¶ 77).

issue in April 2018, when she submitted a note from Dr. Alexis Colvin restricting her from performing tasks that required her to raise her right arm. (Def. 56.1 ¶ 88; *see also* Mirza Decl., Ex. D at BLM000687 (copy of letter)). After submitting this letter, Plaintiff took a leave of absence from April 5, 2018, to May 14, 2018.  (Def. 56.1 ¶ 89).  When Plaintiff returned to work, she submitted a letter from Dr. Colvin lifting the restriction against raising her right arm.  (*Id.* at ¶ 90; *see also* Mirza Decl., Ex. D at BLM000699 (copy of letter)).  Dr. Colvin reimposed the restriction one month later, on June 13, 2018.  (Def. 56.1 ¶ 91; *see also* Mirza Decl., Ex. D at BLM000713 (copy of letter)).  Thereafter, Plaintiff met with Mirza to discuss the restriction.  (Def. 56.1 ¶ 92).  Mirza told Plaintiff during this conversation that Plaintiff "should simply not perform any duties that required her to raise her right arm above her shoulder or that caused her pain," and that "if she needed to reach something at a higher level, she should ask her co-workers or manager to assist her."  (*Id.*).  Following this conversation, Plaintiff was permitted to use the lower bars on clothing racks to hang garments while doing her job.  (*Id.* at ¶ 93).  If clothes were on a higher rack that Plaintiff could not reach without raising her arm and violating her medical restriction, Plaintiff could ask for assistance retrieving the clothes from her coworkers or manager.  (*Id.*).

Plaintiff does not dispute that she was told she could hang clothes on the lower racks or ask her coworkers for help in retrieving clothes from the higher racks, but contends that this accommodation was ineffective in practice.  At some unspecified time, Plaintiff complained to HR that her coworkers were

placing clothes on the higher clothing racks that she could not reach.  (Def. 56.1 ¶ 93).  Dito then created and posted a sign on or near the clothing racks directing Plaintiff's coworkers to hang clothing on the lower racks.  (*Id.*; *see also* Pl. 56.1 ¶ 93).  According to Dito, the sign "seemed to resolve the issue." (Dito Decl. ¶ 38).  Nonetheless, Plaintiff claims that whenever she returned from a vacation or extended leave of absence, "garments would inevitably be [o]n higher racks, and when she asked coworkers to help her by lowering the garments, they made her wait hours."  (Pl. 56.1 ¶ 93).  Plaintiff further claims that "[t]his would make [her] late in finishing work for customers" and that "Defendants then blamed her for the lateness."  (*Id.*).

Relatedly, Plaintiff also testified to an incident that she alleges occurred on or about September 9, 2018.  (Pl. 56.1 ¶ 144).  When Plaintiff arrived at work that morning, she found that Kotsovolos had placed "more than 200 suits on five racks, and instructed Plaintiff to place them on high racks."  (*Id.*). According to Plaintiff's deposition testimony, Kotsovolos then "push[ed] [Plaintiff] to put all the suits in a high level.  I said, I cannot do it.  I have a lot of pain.  She said to me, take your bag and leave from the department right now."  (Pl. Dep. 129:10-13).  Plaintiff then stopped work and went to the HR office.  (*Id.* at 129:14-15).  Ultimately, after speaking to Dito and Kotsovolos, Dito told Plaintiff to return to work.  (*Id.* at 129:20-24; *see also* Pl. 56.1 ¶ 144).

### c.   Sitting

Plaintiff also claims that she was denied an accommodation for an issue with her spine.  (*See* Def. 56.1 ¶ 101).  On October 8, 2019, Plaintiff submitted

a doctor's note that stated that Plaintiff was suffering from a spinal issue and that she would "benefit from [a] 10 minute break after 50 minutes of standing." (Mirza Decl., Ex. D at BLM000823; *see also* Pl. 56.1 ¶ 101).  After receiving this note, Bloomingdale's accommodated Plaintiff by again allowing her to "self-monitor and sit when required."  (Def. 56.1 ¶ 102).  Plaintiff was also provided access to a chair in the Department to use when needed.  (*Id.*).

Plaintiff denies that she was able to sit when needed.  According to Plaintiff, "unlike many Alterations employees (who operated sewing machines or did clerical tasks), Plaintiff's work required her to stand all day long checking garments, for which she could not use a chair."  (Pl. 56.1 ¶ 102).  Plaintiff further claims that the chair made available to her "was near the computer used for clerical tasks, not where Plaintiff worked on [QC]" (*id.*), and that when she did use the chair "Kotsovolos came running and pushed Plaintiff to do something else instead of sitting" (*id.* at ¶ 147).  Plaintiff testified, however, that she could not remember if she ever told Kotsovolos that she had received an accommodation to self-monitor her breaks and use the chair for 10 minutes breaks after standing for 50 minutes.  (*See* Pl. Dep. 137:21-138:5).[8]

---

[8]      Plaintiff states in her briefing that "[i]n about March 2019, Plaintiff had to call Al[l]yssa Maison-Mirza anxiously, because Kotsovolos had been repeatedly demanding that Plaintiff do tasks contrary to her medical restrictions."  (Pl. Opp. 3-4 (citing Pl. 56.1 ¶ 146)).  While Plaintiff includes this allegation in the same paragraph in which she discussed her inability to sit, Plaintiff did not receive the restriction requiring her to sit for 10 minutes after 50 minutes of standing until October 8, 2019.  (*See* Def. 56.1 ¶ 101).  Plaintiff does not otherwise explain the relationship between these two facts.

### d.  Back Issues

Lastly, Plaintiff claims in passing that Toney denied her an accommodation for her lower back pain.  (Pl. 56.1 ¶ 159).  Plaintiff testified in connection with this claim only that Toney "did not accommodate with my lower back, and I have a lot of issues with the lower back.  Some days I stay in bed all day, all day, two, three days."  (Pl. Dep. 313:25-314:5).

While Plaintiff does not elaborate on this claim further, Toney avers that Plaintiff's requests for accommodations were not denied.  (Toney Suppl. Decl. ¶ 5).  Per Toney's declaration, Plaintiff submitted a doctor's note describing her back pain to Toney on October 8, 2019.  (*Id.* at ¶ 6; *see also id.*, Ex. B (copy of note)).  Toney then sent Plaintiff the necessary paperwork to request an accommodation (*id.* at ¶ 7; *see also id.*, Ex. C (copy of paperwork)), told Plaintiff that she would be reaching out to Plaintiff's doctor for additional information (*id.* at ¶ 8; *see also id.*, Ex. D (email from Toney to Plaintiff)), and began internal discussions with the HR team to find an appropriate accommodation (*id.* at ¶ 9; *see also id.*, Ex. E (email thread between and among Toney, Dito, Mirza, and Courtney Cox)).  When Plaintiff failed to submit the paperwork by the deadline, her request was initially denied.  (*Id.* at ¶ 11).  The matter was quickly reopened, however, when Plaintiff reached out and asked for the forms to be resent.  (*Id.* at ¶ 11; *see also id.*, Ex. F (email from Toney to Plaintiff explaining that "here is the form you requested be resent to you" and stating that Toney "sent the old form so you can see that it was sent to you")).  Plaintiff ultimately submitted the completed forms on November 19, 2019.  (*Id.* at ¶ 12; *see also*

*id.*, Ex. G (copy of completed forms)).  Toney suggests that Bloomingdale's was in the process of reviewing the forms and resolving the request at the time Plaintiff was fired.  (*See id.* at ¶ 13).

### e.    Comments Made by Certain Coworkers

Plaintiff also claims that Kotsovolos and certain of her coworkers and other Bloomingdale's employees made several comments related to Plaintiff's medical restrictions and accommodations.[9]  In the first of these alleged comments, Kotsovolos remarked, "if you don't feel good, you stay to your home. Don't come to work[.]"  (Pl. Dep. 320:16-17).  Plaintiff next references a comment she believed DiFranco made in September 2017 or 2018.  (*Id.* at 321:10-11).  According to Plaintiff, DiFranco approached her on the relevant date and asked her, "how long you going to be like this?"  (*Id.* at 321:15). Plaintiff claims to have responded, "I don't know.  I go to my doctors."  (*Id.* at 321:16).  DiFranco replied, "You did the surgery, you did the therapy, if you are not good it is better to stop to work.  Go to stay to your home."  (*Id.* at 321:16-19).  Further, in a supplemental declaration, Plaintiff avers that "[i]n about April 2017, … HR Manager Richard Law said to me: 'If you continue to work in the Company, you'll find other medical issues to complain about, from your head to your toes.  So you should leave the Company."  (Pl. Decl. ¶ 9).

In addition to these comments, Plaintiff also claims to have received a call from someone she believed to be Toney on June 16, 2017.  (*See* Pl. 56.1

---

[9]    Plaintiff's references an untold number of alleged comments in her statement of undisputed facts.  The Court focuses here on those alleged statements on which Plaintiff relies to support her legal claims.

¶ 141).  According to Plaintiff's deposition testimony, she was at home recovering from her second surgery on her hand, which had been performed the day before, when she received a call on her cell phone.  (Pl. Dep. 110:18-21).  Plaintiff testified that the call was from "[s]omebody" in the "accommodation office" whom Plaintiff "believe[d]" to be Toney.  (*Id.* at 110:21-23).  According to Plaintiff, Toney told Plaintiff during this call that "we cannot accommodate you anymore.  We did already so many times."  (*Id.* at 110:24-25).  Plaintiff then testified that she had the following exchange with the caller:

> I said, just yesterday I did the surgery.  We don't care when you did the surgery or what you had.  We cannot accommodate you anymore.  I said, I'm only a few hours after the surgery.  We don't care, she said, okay.  No more accommodation for you.  This was a telephone conversation with the accommodation office.

(*Id.* at 110:25-111:9).  Plaintiff testified that she could not recall if she told the caller that she had already been offered an accommodation doing QC for the Department.  (*Id.* at 112:4-11).  And while Plaintiff further testified that she believed the caller knew that Plaintiff had been offered that accommodation, she did not know of any facts supporting that belief.  (*Id.* at 112:16-113:6).

### 4.  Plaintiff's Disciplinary History

During the period that Plaintiff applied for and received both her medical leaves of absence and her accommodations, she was also subject to multiple forms of discipline for her alleged workplace behavior.  Between 2018 and 2020, Bloomingdale's employee disciplinary policy was known as Responsibility Based Performance ("RBP").  (Def. 56.1 ¶ 26).  The RBP process was used to address attendance, performance, and behavioral issues.  (*Id.* at ¶ 27).  The

basic conceit of the RBP process, in Defendants' words, "was to explain to the employee the shortcomings the employee had exhibited in his or her work, and [to] have the employee acknowledge his or her shortcomings and to own their behavior." (*Id.* at ¶ 26). "In this way[,] the employee would be responsible for their ultimate success or failure[.]" (*Id.*).

The RBP process proceeded in three progressive steps. At the first and second steps, employees received written notices that alerted them to perceived issues with their performance and required them to attend meetings to discuss the stated issues. (Def. 56.1 ¶¶ 29-30). The notification provided at the first step was termed a "Counseling Summary." (*Id.* at ¶ 29). Upon receiving a Counseling Summary, an employee would be required to attend a meeting at which he or she would discuss the Counseling Summary with his or her supervisor, an HR representative, and a shop steward from the relevant labor union. (*Id.*). These Counseling Summary meetings would conclude with everyone present signing the Counseling Summary document. (*Id.*). The notification provided at the second step was known as a "Formal Reminder." (*Id.* at ¶ 30). As with the Counseling Summary, the Formal Reminder carried with it an obligation to attend a meeting with the same people who attended the Counseling Summary meeting and likewise concluded with everyone present signing the Formal Reminder document. (*Id.*).

The third and final step of the RBP process was called a "Decision Making Leave" ("DML"). (Def. 56.1 ¶ 31). Once again, the employee and the same people present at the Counseling Summary and Formal Reminder

meetings would meet and sign the DML document.  (*Id.*).  Following the DML meeting, the employee was given his or her next shift off without pay to allow him or her "to think about his or her issues and decide if he or she wanted to stay employed by [Bloomingdale's] … or if the employee wanted to resign from employment[.]"  (*Id.*).  If the employee elected to return to work, "the employee was expected to come back on the next shift with a written commitment explaining the employee's plan for meeting the Company's expectations" moving forward.  (*Id.* at ¶ 32).  "The employee's commitment was not considered satisfactory if the employee did not own their behavior and commit to change it."  (*Id.*).  If the employee's written commitment was deemed unsatisfactory, Bloomingdale's reserved the right to fire the employee.  (*Id.*).

The responsibility for administering the RBP process was divided between supervisors and HR personnel.  (*See* Def. 56.1 ¶ 33).  Supervisors were charged in the first instance with informing HR of any employee attendance, performance, or behavioral issues.  (*Id.*).  Once such an issue was raised with HR, however, it was HR's ultimate responsibility to determine what, if any, discipline would be administered.  (*Id.*).  After an employee received a write-up, whether it be a Counseling Summary or a Formal Reminder, HR "would not follow up … to see if the process needed to continue — that was the supervisor's responsibility."  (Dito Decl. ¶ 14).  Thus, because write-ups would expire after six months or a year (depending on the form of the write-up), the RBP process would have to start over if a supervisor failed to follow up on a continuing course of unprofessional behavior.  (Def. 56.1 ¶ 34).

16

### a.   June 21, 2018 Formal Reminder

Plaintiff received her first write-up — a Formal Reminder — on June 21, 2018.  (Def. 56.1 ¶ 35; *see also* Dito Decl., Ex. A (Formal Reminder)).[10]  The Formal Reminder stated that Plaintiff's "performance/conduct is not meeting Bloomingdale's expectations" and recounted that on June 6, 2018, Plaintiff "conducted herself in an unprofessional and disruptive manner when addressing her concerns with her co-workers.  As a result, there was a one hour disruption to the business, not only of her time, but of the time of her fellow alterationists as well." (Dito Decl., Ex. A at 1).

The Formal Reminder further reflected that HR members had spoken with Plaintiff on two separate occasions about "her professional conduct" and stated that if Plaintiff had "a concern about her work responsibilities or work environment, she should address that concern with her immediate supervisor in a professional and respectful manner." (Dito Decl., Ex. A at 1).  In connection with this Formal Reminder, Plaintiff attended a meeting with Kotsovolos, Dito, and Jimmy Eisenberg.  (Def. 56.1 ¶ 35).[11]  Plaintiff refused to sign the Formal Reminder at the conclusion of the meeting.  (*Id.*).

---

[10]   Plaintiff received a Formal Reminder on this date, as opposed to a Counseling Summary, because "as noted in the Formal Reminder, [Plaintiff] had already been spoken to by Mirza, Michelle Ronquillo [Bloomingdale's senior director for HR] … and Dito about issues of unprofessional conduct on Plaintiff's part on two previous occasions." (Def. 56.1 ¶ 36).

[11]   As noted earlier, RBP meetings were attended by a shop steward from the applicable union.  (Def. 56.1 ¶ 29).  Employees at Bloomingdale's 59th Street location were members of the Local 3 RWDSU bargaining unit.  (*Id.* at ¶ 21).  Eisenberg was a shop steward for this union, and thus attended the RBP meetings with Plaintiff.  (*Id.* at ¶ 47).

### b.    March 18, 2019 Counseling Summary

Plaintiff received a Counseling Summary on March 18, 2019.  (Def. 56.1 ¶ 38; *see also* Dito Decl., Ex. B (Counseling Summary)).[12]  The Counseling Summary again stated that Plaintiff's "performance/conduct [was] not meeting Bloomingdale's expectations" and reflected that:

> On Monday[,] March 4th[,] 2019, [Plaintiff] conducted herself in an unprofessional and disruptive manner when addressing her concerns with her co-workers and her manager.  [Plaintiff] did not address her concerns about item placement with her manager and co-workers professionally or in a cooperative manner.  [Plaintiff] became loud and disruptive and caused a disturbance in the Alterations Shop.    [Plaintiff] dismissed her Manager's instructions to stop conducting herself unprofessionally and ignored her assistance to help her move the items to a lower bar.

(Dito Decl., Ex. B at 1).  The Counseling Summary also noted that on March 12, 2019, Plaintiff called Mirza and was "combative and argumentative when trying to have her concerns addressed." (*Id.*).  The Counseling Summary concluded by reminding Plaintiff to speak with her supervisor or HR about her concerns with her responsibilities or work environment.  (*Id.* at 2).  As before, Plaintiff attended a meeting in connection with the Counseling Summary that was also attended by Kotsovolos, Eisenberg, and Dito.  (*Id.* at 3).  Plaintiff again declined to sign the Counseling Summary.  (Def. 56.1 ¶ 39).

---

[12]    "Because six months had passed since the June 21, 2018 Formal Reminder, the RBP process had to begin anew, and as a result it did not then escalate to a DML." (Def. 56.1 ¶ 38).

### c.   August 29, 2019 Formal Reminder

Plaintiff received a Formal Reminder on August 29, 2019.  (Def. 56.1 ¶ 40; *see also* Dito Decl., Ex. C (Formal Reminder)).  This Formal Reminder identified several instances in which Plaintiff's "performance/conduct [was] not meeting Bloomingdale's expectations."  (Dito Decl., Ex. C at 1).  The Formal Reminder stated that on June 10, 2019, Plaintiff

> conducted herself unprofessionally when … Kotsovolos … asked her to input paperwork in the computer.  [Plaintiff] became loud and disruptive and caused a disturbance in the Alterations Shop.  [Plaintiff] also loudly said she would not do the computer work given, and would call her lawyer.  [Plaintiff] dismissed [Kotsovolos's] instructions to stop conducting herself unprofessionally.  [Plaintiff] also accused [Kotsovolos] of calling [Plaintiff] a terrorist.  This type of accusation is unprofessional and creates an unprofessional work environment.

(*Id.*).  Similarly, the Formal Reminder stated that on June 12, 2019, Plaintiff "spoke to her supervisor, … DiFranco …, in a confrontational tone"; that on July 31, 2019, Plaintiff "conducted herself in an unprofessional and disruptive manner when addressing her concerns with her co-workers[,]" including by "openly and loudly accus[ing] [DiFranco] of destroying the department and berat[ing] her for coming in early."  (*Id.*).  Plaintiff further "loudly claimed that [DiFranco] was hiding garments[,]" according to the Formal Reminder.  (*Id.*).  Plaintiff, Morrow (who was then Kotsovolos's supervisor), Eisenberg, and Dito attended a meeting to address this Formal Reminder.  (*Id.* at 3).  Once again, Plaintiff refused to sign the Formal Reminder.  (Def. 56.1 ¶ 41).

On September 19, 2019, Plaintiff emailed a written rebuttal to the Formal Reminder to Dito.  (Def. 56.1 ¶ 42; *see also* Dito Decl., Ex. D).  In this email, Plaintiff stated that she had "consistently engaged in appropriate behavior throughout [her] tenure with Bloomingdale[']s."  (Dito Decl., Ex. D). She further stated that she "believe[d] it [was] important to create context for some of the accusations made against [her]" and then stated that she had refused to perform the computer work that Kotsovolos had asked her to do on June 10, 2019, because using the computer was made painful by her medical condition.  (*Id.*).  She concluded by "strongly request[ing] that Bloomingdale[']s and its managers work with [her] to accommodate [her] medical condition reasonably, and in accordance with [her] rights under the law."  (*Id.*).

### d.    September 26, 2019 Decision Making Leave

Plaintiff's disciplinary issues continued.  On September 26, 2019, Plaintiff received a DML.  (Def. 56.1 ¶ 43; *see also* Watkins-Utsey Decl., Ex. A (DML)).  The DML identified three separate incidents in which Plaintiff's conduct had not met Bloomingdale's expectations.  The first incident occurred on September 12, 2019, when Plaintiff "interrupted two supervisors (Rosa DiFranco and Giuseppe Polichetti) who were discussing a garment for a customer."  (Watkins-Utsey Decl., Ex. A at 1).  According to the DML, Plaintiff "repeatedly told them to stop speaking since they were not on their break." (*Id.*).  The next incident occurred on September 13, 2019, when Plaintiff had a conversation with Kotsovolos about the prior day's incident and was "not completely candid about her involvement" in it.  (*Id.*).  The DML states that

Plaintiff "turned the discussion with [Kotsovolos] into an argument where she … shouted at her and her coworkers." (*Id.*).  "As a result of this behavior," the DML states, Polichetti "was sent to the hospital." (*Id.*).  Lastly, the DML describes an incident that occurred on September 25, 2019, when Plaintiff "denied [Kotsovolos's] … request to mark garments." (*Id.*).  According to the DML, Plaintiff "responded that she would not mark the garments and accused [Kotsovolos] of violating her accommodation by asking her to use scissors. When [Kotsovolos] reiterated that she was not asking her to use scissors, and was only asking her to mark the garments, [Plaintiff] became argumentative," "replied to [Kotsovolos] in Greek," and eventually "walked away and did not return for more than 30 minutes." (*Id.* at 1-2).  The DML stated that "[w]itnesses to [Plaintiff's] outburst corroborated that [Plaintiff] spoke in a loud tone, exhibited rude behavior, ignored [Kotsovolos's] request to speak in English[,] and walked away from [Kotsovolos] mid-conversation." (*Id.* at 2).

Plaintiff attended the DML meeting with Eisenberg, Morrow, and Dito's supervisor, Anita Watkins-Utsey. (Watkins-Utsey Decl., Ex. A at 3; *see also id.* at ¶ 28).  In contrast with the earlier Counseling Summary and Formal Reminder meetings, Dito did not attend the DML meeting because "it was clear to [her] that [her] comments were having no impact on [Plaintiff's] behavior." (Dito Decl. ¶ 25).  At the meeting, Watkins-Utsey conveyed to Plaintiff that "any further unprofessional or disruptive conduct would result in [Plaintiff] being separated from the company." (Watkins-Utsey Decl. ¶ 5).  Watkins-Utsey "made this as clear as [she] could[,] as [she] wanted Plaintiff to know how

serious the situation was and this was her last chance." (*Id.*).  Plaintiff refused to sign the DML at the conclusion of the meeting.  (*Id.*, Ex. A at 3).

### e.   January 17, 2020 Firing

In early January 2020, Plaintiff was involved in two further incidents with her coworkers.  The first incident involved an interaction between Plaintiff and DiFranco.  (Def. 56.1 ¶ 48).  DiFranco testified at her deposition that her boss, Natalia Surazhsky, had handed a coworker, Karim, two shirts and told Karim to return the shirts to her after he finished working on them.  (Gerber Decl., Ex. C (Dkt. #109-4) at 63:23-24).  DiFranco then saw Karim holding the shirts while talking to Plaintiff, and approached Karim to tell him to bring the shirts directly to Surazhsky.  (*Id.* at 64:6-9).  In response, Plaintiff "said go back to your place and do your own job." (*Id.* at 10-11).

The second incident involved Polichetti and a new Department employee, Geraldine Nushi.  (Def. 56.1 ¶ 49).  Defendants state that

> [i]n this interaction, Polichetti was assisting Nushi by giving Nushi direction on how to finish altering a garment.  Plaintiff kept insisting she had to review the alterations on the garment — even though it was not finished.  Plaintiff told Nushi that Nushi was not doing quality work in front of all the [Department] employees then at work.  Nushi was understandably embarrassed and upset.

(*Id.*).

Following these incidents, Dito obtained statements from each of the Department employees who were present and then met with Morrow and Watkins-Utsey to discuss Plaintiff's conduct.  (Def. 56.1 ¶ 50; *see also* Dito Decl., Ex. G (copies of letters from DiFranco, Nushi, and Polichetti concerning

the incidents)).  Dito, Morrow, and Watkins-Utsey then collectively decided to fire Plaintiff.  (Def. 56.1 ¶ 50).  Plaintiff was fired effective January 17, 2020. (*Id.* at ¶ 51).  Plaintiff's exit form stated that she had been fired for "failure to meet expectations for conduct/behavior."  (Dito Decl., Ex. H).  Plaintiff's final day of work at the Store was January 16, 2020.  (Def. 56.1 ¶ 51).[13]

## B.    Procedural Background

Plaintiff filed the initial complaint in this case on February 25, 2020 (Dkt. #1), and the Amended Complaint on April 17, 2020 (Dkt. #9 ("AC")).[14] Macy's, Bloomingdale's, and Kotsovolos filed their answer to the Amended Complaint on June 18, 2020 (Dkt. #61), and the parties were automatically referred to mediation shortly thereafter (Dkt. #62).  On August 18, 2020, it was reported to the Court that mediation had been unsuccessful in resolving the case.  Following a telephonic pretrial conference held on September 10, 2020 (*see* Minute Entry for September 10, 2020), the Court entered the parties' Civil Case Management Plan and Scheduling Order and the parties proceeded to discovery (Dkt. #82).  On September 22, 2020, Di Franco, Dito, Mirza, Morrow, and Toney filed their answers to the Amended Complaint.  (Dkt. #88, 89).

On May 5, 2021, the Court held a pre-trial conference at which it set a briefing schedule for Defendants' anticipated motion for summary judgment. (*See* Minute Entry for May 5, 2021).  Defendants filed their opening motion and

---

[13]    In addition to the conduct-related RBP write-ups discussed in the foregoing section, Plaintiff also received two write-ups for performance-related issues during her time at the Store.  (*See* Dito Decl. ¶ 30; *see also id.*, Ex. I, J (copies of the write-ups)).

[14]    Due to docketing errors, Plaintiff refiled the complaint on February 26, 2020 (Dkt. #3) and the Amended Complaint on April 21, 2020 (Dkt. #29).

supporting papers on September 3, 2021.  (Dkt. #99-109).  Plaintiff filed her

opposition brief and supporting papers on October 8, 2021.  (Dkt. #111-112).

Defendants then filed their reply brief and supplemental declarations in

support of their motion on October 29, 2021.  (Dkt. #113-122).  Accordingly,

Defendants' motion is fully briefed and ripe for the Court's decision.

## DISCUSSION

Plaintiff asserts fourteen causes of action under four separate federal,

state, and city statutes.  (*See generally* AC 37-44).  As against Bloomingdale's,

Plaintiff asserts claims for (i) discrimination under the ADA, NYSHRL, and

NYCHRL; (ii) retaliation under the ADA, FMLA, NYSHRL, and NYCHRL;

(iii) interference under the FMLA and NYCHRL; (iv) failure to accommodate

under the ADA and NYSHRL; and (v) hostile work environment under the ADA,

NYSHRL, and NYCHRL.  Plaintiff asserts identical claims under the NYSHRL

and NYCHRL against the Individual Defendants, but does not assert claims

against them under either the ADA or FMLA.  Defendants have moved for

summary judgment as to each of these claims.  The Court focuses its analysis

(with two exceptions that will be addressed later) on Plaintiff's claims arising

under federal law.  After finding that Defendants are entitled to summary

judgment as to each of these claims, the Court declines to exercise

supplemental jurisdiction over Plaintiff's surviving state and city claims.

## A.    Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).[15]   A fact is "material" if it "might affect the outcome of the

suit under the governing law," and is genuinely in dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Jeffreys* v.

*City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

   The moving party bears the initial burden of demonstrating "the absence

of a genuine issue of material fact."   *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323

(1986).  The movant may discharge its burden by showing that the nonmoving

party has "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the

burden of proof at trial."   *Id.* at 322; *see also Selevan* v. *N.Y. Thruway Auth.*,

711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate

where the non-moving party failed to "come forth with evidence sufficient to

permit a reasonable juror to return a verdict in his or her favor on an essential

element of a claim" (internal quotation marks omitted)).

   If the moving party meets this burden, the nonmoving party must "set

forth specific facts showing that there is a genuine issue for trial" using

---

[15]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary
judgment standard from a genuine "issue" of material fact to a genuine "dispute" of
material fact.   *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting
that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue'
becomes genuine 'dispute.'   'Dispute' better reflects the focus of a summary-
judgment determination.").   This Court uses the post-amendment standard, but
continues to be guided by pre-amendment Supreme Court and Second Circuit
precedent that refer to "genuine issues of material fact."

affidavits or otherwise but cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Borley* v. *United States*, 22 F.4th 75, 78 (2d Cir. 2021) (internal alterations omitted).

B.    **The Court Grants Summary Judgment as to Plaintiff's Discrimination Claim Under the ADA**

1.    **Applicable Law**

The ADA bars discrimination "against a qualified individual on the basis of disability in regard to ... discharge of employees ... and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Disability discrimination claims brought under the ADA are analyzed using the burden-shifting framework adopted in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).  *See McMillan* v. *City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).

Under this framework, "[a] plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Sista* v. *CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman* v. *Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program,* 198 F.3d 68, 72 (2d Cir. 1999)).

To establish a *prima facie* case of disability discrimination, "the 'plaintiff must show that [i] he is a member of a protected class; [ii] he was qualified for the position he held; [iii] he suffered an adverse employment action; and [iv] the adverse action took place under circumstances giving rise to the inference of discrimination.'"  *Williams* v. *Newburgh Enlarged City Sch. Dist.*, 803 F. App'x 485, 489 (2d Cir. 2020) (summary order) (quoting *Ruiz* v. *County of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010)).  "The burden of establishing a *prima*

*facie* case is not onerous, and has been frequently described as minimal."
*Walsh* v. *N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016).

Once a plaintiff establishes a *prima facie* case of disparate treatment, the
burden shifts to the defendant to articulate a legitimate, nondiscriminatory
reason for the challenged employment decision.  *See Patterson* v. *Cnty. of
Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).  "Defendants' burden at this
stage is not to prove nondiscrimination.  Instead, defendants must introduce
evidence which, taken as true, would permit the conclusion that there was a
nondiscriminatory reason for the adverse action."  *Albuja* v. *Nat'l Broad. Co.
Universal*, 851 F. Supp. 2d 599, 610 (S.D.N.Y. 2012) (citation, internal
quotation marks, and emphasis omitted).

If the defendant articulates a legitimate, nondiscriminatory reason for the
adverse action, "the presumption of discrimination vanishes and the burden
shifts back to the plaintiff to come forward with evidence that the employer's
proffered explanations were merely pretextual and that the actual motivations
more likely than not were discriminatory."  *Abdu-Brisson* v. *Delta Air Lines, Inc.*,
239 F.3d 456, 469 (2d Cir. 2001).  To discharge this final burden, the plaintiff
"must establish 'circumstances that would be sufficient to permit a rational
finder of fact to infer that the employer's employment decision was more likely
than not based in whole or in part on discrimination.'"  *Sullivan* v. *N.Y.C. Dep't
of Investigation*, 163 F. Supp. 3d 89, 99 (S.D.N.Y. 2016) (quoting *Kirkland* v.
*Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).  Importantly, at this final
step the ADA requires that the plaintiff "show that his or her disability was the

'but-for' cause of the employer's conduct — not merely a 'motivating factor.'" *Wein* v. *N.Y.C. Dep't of Educ.*, No. 18 Civ. 11141 (PAE), 2020 WL 4903997, at *12 (S.D.N.Y. Aug. 19, 2020) (citing *Natofsky* v. *City of New* York, 921 F.3d 337, 348-49 (2d Cir. 2019), and *Bonds* v. *County of Westchester*, No. 19 Civ. 1712 (KMK), 2020 WL 4347704, at *9 (S.D.N.Y. July 28, 2020)). "What this means in the summary judgment context is that the plaintiff must establish a genuine issue of material fact … as to whether the employer's reason for [any adverse action] is false *and* as to whether it is more likely that a discriminatory reason' was the but-for cause of the adverse employment action." *Id.* (quoting *Gallo* v. *Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)) (emphasis in original).

### 2. Analysis

#### a. *Prima Facie* Case

Defendants concede for purposes of their motion that Plaintiff has established the first three elements of her *prima facie* case (*i.e.*, that Bloomingdale's is subject to the ADA, Plaintiff is disabled, and Plaintiff was qualified to perform her job), but move for summary judgment on the basis that she has failed to demonstrate that she suffered an adverse employment action *because of* her disability.  (Def. Br. 5).  Pointing to the fact that Plaintiff requested and received numerous leaves of absence and several different medical accommodations during her time at the Store, Defendants argue that Plaintiff has not shown a causal connection between her ultimate firing and her various medical conditions.  (*Id.* at 6).  To the contrary, Defendants maintain

29

that Plaintiff's termination can be sourced solely to her negative interactions with her coworkers as well as her repeated failures to alter her behavior after being told do so as she progressed through the RBP process.  (*Id.* at 6-7).[16]

Plaintiff seeks to establish a causal connection between her disability status and termination based on (i) the temporal relationship between her request for a medical leave of absence and her termination and (ii) certain purported inconsistencies in the reasons given for her termination.  (Pl. Opp. 8-10).  As to the temporal relationship, Plaintiff notes that she submitted her final request for a leave of absence on January 13, 2020, and was fired "only three days later" on January 16, 2020.  (*Id.* at 9 (emphasis omitted)).  And as to the alleged inconsistencies, Plaintiff notes that "while Defendants long took pains to compile Plaintiff's purported disciplinary infractions, they somehow waited to act on her final warning and to take adverse action against her until after her final surgery request."  (*Id.*).  Plaintiff asserts that "[t]his suspicious inconsistency suffices to demonstrate potential pretext, and to create a triable question of fact regarding Defendants' motives and intent."  (*Id.*).

The Court will assume that Plaintiff has met her burden of establishing the fourth and final element of her *prima facie* case.  As several courts have observed, "there are circumstances in which a court will presume a plaintiff has established a *prima facie* case and proceed directly to the third step

---

[16]    Defendants assert that "[w]hile Plaintiff may point to the various disciplinary write-ups she received, in the Second Circuit, such write-ups are not adverse actions."  (Def. Br. 5).  Plaintiff does not address, much less dispute, this assertion or discuss any adverse action in her brief other than her termination.  (*See* Pl. Opp. 8-9).  Accordingly, the Court considers only whether Plaintiff has tied her firing to her disabilities.

of *McDonnell Douglas*."  *Keshinover* v. *N.Y.S. Off. of Parks, Recreation & Historic Pres.*, No. 17 Civ. 4349 (CS), 2019 WL 5212235, at *8 (S.D.N.Y. Oct. 15, 2019), *aff'd,* 826 F. App'x 109 (2d Cir. 2020) (summary order).  This approach is appropriate where, as here, the defendant "focuses primarily on its legitimate reason for terminating [the p]laintiff's employment[.]"  *Terpstra* v. *Shoprite Supermarket, Inc.*, No. 17 Civ. 6840 (KMK), 2019 WL 3338267, at *5 (S.D.N.Y. July 25, 2019); *see also Walsh*, 828 F.3d at 75-76 (proceeding directly to the third step of the *McDonnell Douglas* analysis in view of the plaintiff's minimal burden at the *prima facie* stage and plaintiff's nonobjection to the existence of a legitimate, nondiscriminatory explanation for defendant's adverse employment action); *Maynard* v. *Montefiore Med. Ctr.*, No. 18 Civ. 8877 (LAP), 2021 WL 396700, at *10 (S.D.N.Y. Feb. 4, 2021) (explaining that a court may "simply assume that a plaintiff has established a *prima facie* case and skip to the final step in the *McDonnell Douglas* analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action").  This approach is appropriate under these circumstances "because a plaintiff who can prevail at the third stage of the *McDonnell Douglas* process has necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on his/her claim whether or not there exist circumstances giving rise to an inference of discrimination."  *Gilani* v. *Teneo, Inc.*, No. 20 Civ. 1785 (CS), 2021 WL 3501330, at *18 (S.D.N.Y. Aug. 4, 2021) (quoting *Johnson* v. *Ultravolt, Inc.*, No. 13 Civ. 3518 (DRH), 2015 WL 541519, at *4 (E.D.N.Y. Feb. 10, 2015)).

For these reasons, the Court assumes that Plaintiff has met her burden of establishing a *prima facie* case of disability discrimination.

### b.   Defendants' Non-Discriminatory Explanation

While courts often proceed directly to the third step of the *McDonnell Douglas* analysis, the Court briefly pauses at the second step to consider Defendants' proffered non-discriminatory reason for Plaintiff's termination.  At this stage, "'the defendant must produce evidence' which supports a 'clear and specific' explanation for the termination, and which, 'taken as true, would permit the conclusion that there was a non-discriminatory reason for the adverse action.'"  *Lopez* v. *White Plains Hosp.*, No. 19 Civ. 6263 (KMK), 2022 WL 1004188, at *11 (S.D.N.Y. Mar. 30, 2022) (quoting *Carlton* v. *Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000)) (internal alteration omitted).

Defendants have comfortably met their burden of coming forward with a legitimate, nondiscriminatory reason for their decision to fire Plaintiff.  According to Defendants, Plaintiff's termination "was tied solely to [her] behavior and conduct."  (Def. Br. 5).  By way of illustration, Defendants point to the fact that Plaintiff cycled through the RBP process multiple times and was specifically told by Watkins-Utsey at her DML meeting on September 26, 2019, that any further misconduct would result in her termination.  (*Id.* at 7-8 (citing Def. 56.1 ¶¶ 35-53)).  Despite this warning, Defendants argue, Plaintiff engaged in unprofessional confrontations with DiFranco, Polichetti, and Nushi in early January 2020, leading Dito, Morrow, and Watkins-Utsey to decide to fire her on January 16, 2020.  (*Id.* at 8).  "Courts have routinely found that a plaintiff's

display of poor judgment, an inability to take constructive feedback, and an inability to follow directions to be legitimate non-discriminatory reasons for termination." *Lopez*, 2022 WL 1004188, at *11 (collecting cases). Accordingly, this evidence is sufficient to support a finding that Defendants terminated Plaintiff because of her violation of Bloomingdale's workplace policies.

### c.   Pretext

The Court now turns to the third and final step of the *McDonnell Douglas* analysis. At this stage, Plaintiff bears the burden of coming forward with "adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [Defendants] were false, and that more likely than not [her disability] was the real reason for the discharge." *Maresca* v. *City of New York*, 514 F. App'x 37, 39 (2d Cir. 2013) (summary order) (quoting *Holt* v. *KMI-Cont'l, Inc.,* 95 F.3d 123, 129 (2d Cir. 1996)). To satisfy this burden, Plaintiff must show not only that her disability was *a* reason for her discharge, but that it was the *but-for* cause. *Natofsky*, 921 F.3d at 348-49.

Here, Plaintiff has failed to put forward evidence that would allow a reasonable factfinder to conclude that the stated reason for her termination was pretextual. Plaintiff's primary evidence of pretext consists of the temporal relationship between her final request for medical leave (January 13, 2020) and her termination (January 16, 2020). (*See* Pl. Opp. 9.) But while Plaintiff is undoubtedly correct that the two events occurred in quick succession, she fails to grapple with the broader context surrounding the events. As noted earlier, Plaintiff progressed through the RBP process from June 21, 2018, through

January 16, 2020.  (*See* Def. 56.1 ¶¶ 35-53).  Each write-up that Plaintiff received over this period described instances in which she had engaged in disruptive or unprofessional interactions with her coworkers or supervisors. (*See* Dito Decl., Ex. A-C; Watkins-Utsey Decl., Ex. A).  These events ultimately came to a head at the September 26, 2019 DML meeting, at which Watkins-Utsey told Plaintiff that any further unprofessional conduct of the kind described in her previous Counseling Summaries and Formal Reminders would result in her termination from the Store.  (Def. 56.1 ¶ 44).  Notwithstanding the precision of this warning, Plaintiff engaged in similar disputes with her coworkers in January 2020.  (*Id.* at ¶¶ 48-49).  Shortly after these incidents, Dito, Watkins-Utsey, and Morrow made the decision to fire Plaintiff, with each reporting that their decision was based solely on her alleged unprofessional conduct.  (*See* Dito Decl. ¶ 29; Watkins-Utsey Decl. ¶ 11; Morrow Decl. ¶ 10). On this record, the timing of Plaintiff's termination is insufficient on its own to demonstrate that the stated reason for her release was pretextual.  *See Fall* v. *N.Y.S. United Tchrs.*, 289 F. App'x 419, 421 n.5 (2d Cir. 2008) (summary order) (finding that "[a]lthough the timing of a discharge can give rise to an inference of improper motivation," such an inference was unreasonable where the plaintiff had "documented performance problems" through her employment).

While Plaintiff attempts to draw further support for her claim from a purported "suspicious inconsistency" in Defendants' actions, she ultimately falls short in identifying any inconsistencies.  (*See* Pl. Opp. 9).  Observing that "Defendants long took pains to compile Plaintiff's purported disciplinary

34

infractions," Plaintiff emphasizes that "they somehow waited to act on her final warning and to take adverse action against her until after her final surgery request." (*Id.*).  Plaintiff's argument only serves to underscore the fatal weakness in her discrimination claim.  As Plaintiff observes, Watkins-Utsey told Plaintiff on September 26, 2019, that any further behavioral misconduct would lead to her termination (Def. 56.1 ¶ 44), and Plaintiff was not fired until nearly four months later, on January 16, 2020 (*id.* at ¶ 51).  But there is no dispute that Plaintiff did not engage in any reported misconduct between late September 2019 and "early January 2020." (*See id.* at ¶ 48).  Thus, Defendants' decision not to fire her during that period, and to do so only after she engaged in further misconduct in mid-January 2020, is entirely consistent with Watkins-Utsey's warning on September 26, 2019.

Because Plaintiff has not come forward with other evidence of pretext, the Court finds that "[t]here is simply not enough evidence in the record to raise a triable issue as to whether Defendants' proffered reason for the [termination] was pretextual." *Forrester* v. *Prison Health Servs., Inc.*, 651 F. App'x 27, 29 (2d Cir. 2016) (summary order).  Accordingly, the Court grants Defendants summary judgment as to Plaintiff's ADA discrimination claim.

## C. The Court Grants Summary Judgment as to Plaintiff's Retaliation Claims Under the ADA and FMLA

### 1. Applicable Law

Claims for retaliation under the ADA and FMLA are also evaluated using the *McDonnell Douglas* burden-shifting framework.  *See Blodgett* v. *22 S. St. Operations, LLC*, 828 F. App'x 1, 4 (2d Cir. 2020) (summary order); *see also*

35

*Bernheim* v. *N.Y.C. Dep't of Educ.*, No. 19 Civ. 9723 (VEC) (JLC), 2021 WL

2619706, at *3 (S.D.N.Y. June 25, 2021), *report and recommendation*

*adopted*, No. 19 Civ. 9723 (VEC), 2021 WL 4198126 (S.D.N.Y. Sept. 15, 2021).

"On a motion for summary judgment on a retaliation claim, 'the plaintiff

must first present sufficient evidence to make out a *prima facie* case, that is,

evidence sufficient to permit a rational trier of fact to find [i] that she engaged

in protected participation or opposition under [the ADA or FMLA], [ii] that the

employer was aware of this activity, [iii] that the employer took adverse action

against the plaintiff, and [iv] that a causal connection exists between the

protected activity and the adverse action, *i.e.*, that a retaliatory motive played a

part in the adverse employment action.'" *Norman* v. *NYU Langone Health Sys.*,

492 F. Supp. 3d 154, 166 (S.D.N.Y. 2020) (quoting *Lovejoy-Wilson* v. *NOCO*

*Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)), *aff'd*, No. 20-3624-cv (L),

2021 WL 5986999 (2d Cir. Dec. 17, 2021) (summary order).  "Once a plaintiff

establishes a *prima facie* case of retaliation, the burden shifts to the defendant

to articulate a legitimate, non-retaliatory reason for the challenged employment

decision." *Treglia* v. *Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  "If a

defendant meets this burden, 'the plaintiff must point to evidence that would

be sufficient to permit a rational factfinder to conclude that the employer's

explanation is merely a pretext for impermissible retaliation.'" *Id.* (quoting

*Cifra* v. *G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

As relevant here, a plaintiff may discharge her initial burden of

demonstrating a causal connection between her protected activity and an

adverse action "'either: [i] indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or [ii] directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Norman*, 492 F. Supp. 3d at 166 (quoting *Gordon* v. *N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  At the next stage of the *McDonnell Douglas* analysis, however, mere temporal proximity between the protected activity and adverse employment action, "without more," is "insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." *Sivio* v. *Vill. Care Max*, 436 F. Supp. 3d 778, 801 (S.D.N.Y. 2020) (quoting *El Sayed* v. *Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)); *see also Abrams* v. *Dep't of Pub. Safety*, 764 F.3d 244, 254-55 (2d Cir. 2014) (stating that "temporal proximity alone is not enough to establish pretext in this Circuit" and affirming entry of summary judgment for defendants where plaintiff "alleged nothing beyond temporal proximity to establish pretext").

### 2.  Analysis

#### a.  ADA

Beginning with Plaintiff's retaliation claim under the ADA, the first three elements of Plaintiff's *prima facie* case are largely uncontested.  "For the first element, '[e]mployees engage in protected activity when they have a good faith, reasonable belief that they have made a complaint opposing an employment practice made unlawful by ... the ADA.'" *Stryker* v. *HSBC Sec. (USA)*, No. 16

Civ. 9424 (JGK), 2020 WL 5127461, at *12 (S.D.N.Y. Aug. 31, 2020) (quoting *Salas* v. *N.Y.C. Dep't of Investigation*, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018)). Relatedly, "reasonable accommodation requests have long been considered protected activity" under the ADA. *Bernheim* v. *N.Y.C. Dep't of Educ.*, No. 19 Civ. 9723 (VEC), 2021 WL 4198126, at *3 (S.D.N.Y. Sept. 15, 2021) (collecting cases). There is no dispute that Plaintiff requested several accommodations or that she complained that certain of her accommodations were not being respected. (*See* Def. Br. 9).[17] Further, the parties agree that Bloomingdale's was aware of Plaintiff's requests and complaints and that Plaintiff was disciplined and ultimately fired. (*Id.*; Pl. Opp. 9-10).

By contrast, the parties vehemently contest whether Plaintiff has demonstrated a causal connection between her protected activities and her discipline or termination. In Plaintiff's view, the requisite causal connection may be inferred from Kotsovolos's and Mirza's alleged maltreatment of her. (Pl. Opp. 11). Plaintiff asserts that "Kotsovolos often pushed [her] to complete work instead of taking breaks, and this worsened Plaintiff's carpal tunnel pain and numbness." (*Id.*). Plaintiff also states that "she feared sitting down to rest her back because whenever she did, Kotsovolos came running and pushed Plaintiff

---

[17]     Defendants do not dispute that "[r]equesting a reasonable accommodation is protected activity under the ADA" or that "[t]here was no shortage of complaints by Plaintiff during her employment" of "improper treatment and allegations of her restrictions being violated[.]" (Def. Br. 8). But Defendants contend that "[e]ach of these issues was investigated and shown to be unsubstantiated." (*Id.* at 9). To the extent Defendants ask the Court to find that Plaintiff did not engage in protected activity, the Court finds their argument to be unpersuasive. Even if Plaintiff's complaints were ultimately deemed unfounded, the important point for purposes of her retaliation claim is that she believed she was submitting a complaint in good faith.

to do something else instead of sitting." (*Id.*).  Lastly, Plaintiff claims that when she "presented a May 13, 2019 letter from [her doctor] allowing her to return to work but not type or use a computer, ... Mirza suggested that Plaintiff should not return to work." (*Id.*).  Based on these alleged incidents, Plaintiff asserts that Kotsovolos and Mirza "effectively changed Plaintiff's working conditions to take advantage of her 'unique vulnerabilities' and retaliate against her for seeking the reasonable accommodations she needed." (*Id.*).

Preliminarily, the Court observes that Plaintiff has not addressed the relevant legal issue raised by Defendants' brief.  Plaintiff devotes the entirety of the relevant portion of her opposition brief discussing actions taken by Kotsovolos and Mirza that she suggests were motivated by a retaliatory animus.  (*See* Pl. Opp. 11).  But Plaintiff has failed to identify an evidentiary link between Kotsovolos's or Mirza's alleged comments and actions and any adverse employment action that Plaintiff experienced at the Store.  While there is no dispute that Plaintiff progressed through the RBP process and was ultimately let go from the Store, Plaintiff concedes that neither Kotsovolos or Mirza was responsible for making these decisions.  (*See* Pl. 56.1 ¶¶ 109, 112).[18] To the contrary, Plaintiff agrees that Dito, Morrow, and Watkins-Utsey were solely responsible for these actions.  (*Id.* at ¶ 50).  Yet Plaintiff does not even attempt to come forward with evidence that would demonstrate that Dito,

---

[18]     Although Defendants contend that the discipline Plaintiff received through the RBP process did not constitute an adverse employment action because it did not materially alter her working conditions, they argue that Plaintiff's claim would fall short even if the Court were to find that her discipline amounted to an adverse action.  (Def. Br. 5-6).  As explained in the balance of this section, the Court agrees with Defendants on this point.

Morrow, or Watkins-Utsey made the decision to let her go *because of* her

protected activities.  This failure is itself sufficient to doom Plaintiff's claim.[19]

Even assuming that Kotsovolos's and Mirza's alleged actions could

suffice to show a causal connection between her protected activities and her

discipline or termination, Plaintiff has not explained how either of the

particular acts she identifies — Kotsovolos's interruptions of her breaks or

Mirza's alleged comment — shows that she was disciplined or fired for

requesting accommodations for her medical issues.  Take, for example,

Plaintiff's claim that Kotsovolos "often pushed Plaintiff to complete work

instead of taking breaks[.]"  (Pl. Opp. 11).  While a supervisor who purposefully

denies an employee an accommodation as punishment for either requesting the

accommodation or complaining that she was not receiving the accommodation

in practice could plausibly provide sufficient evidence to establish a *prima facie*

case of retaliation, Plaintiff fails to point to evidence suggesting that was what

happened here.  In fact, Plaintiff concedes that while Kotsovolos "might have

inadvertently asked Plaintiff to do something when she was thinking of taking a

break, it was not intentional," and that Kotsovolos was not "attempting to

---

[19]    Although not raised in the relevant portions of the parties' briefs, "[t]he 'cat's paw'
theory of liability imputes a discriminatory motive to a decisionmaker of an adverse
employment action where such action is proximately caused by the animus of his
subordinate — that is, 'the supervisor, acting as agent of the employer, has permitted
himself to be used as the conduit of the subordinate's prejudice.'"  *Gentleman* v. *State
Univ. of N.Y. Stony Brook*, No. 21-1102-cv, 2022 WL 1447381, at *4 (2d Cir. May 9,
2022) (summary order) (quoting *Vasquez* v. *Express Ambulance Serv., Inc.*, 835 F.3d
267, 272 (2d Cir. 2016)).  While the Second Circuit has "never determined whether the
'cat's paw' theory of liability can apply under the 'but-for' standard of causation
applicable to claims under the ADA[,]" the Court "need not address that issue here
because there is insufficient evidence from which a rational jury could find but-for
causation, even if [Plaintiff] is permitted to rely upon this theory of liability."  *Id.*

interfere with Plaintiff taking her breaks." (Pl. 56.1 ¶ 124). Given this concession, Plaintiff's assertion of a retaliation claim based on Kotsovolos's purported desire to retaliate against her finds no support in the record.

Rather than come forward with the evidence needed to support her retaliation claim, Plaintiff merely asserts that "[i]n light of the ample evidence that Defendants' motives were retaliatory and their stated non-discriminatory reasons pretextual, the causal connection between Plaintiff's many protected acts and her discipline and termination are ultimately questions of fact[.]" (Pl. Opp. 11-12). But neither the Court nor a reasonable factfinder can find a causal connection between Plaintiff's protected activities and her discipline or termination merely because she insists that one exists. Because Plaintiff has failed to come forward with evidence suggesting that she was disciplined or fired because she requested accommodations or complained that certain of her accommodations were being denied to her in practice, the Court grants Defendants summary judgment as to her retaliation claim under the ADA.

### b.   FMLA

The parties' dispute under the FMLA is similarly limited to whether Plaintiff has demonstrated that she suffered an adverse employment action "under circumstances giving rise to an inference of retaliatory intent." *Greenberg* v. *State Univ. Hosp.-Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020) (summary order). (*See* Def. Br. 13; Pl. Br. 12). Plaintiff seeks to meet her burden of establishing such an inference through her deposition testimony "that multiple Defendants suggested that she should simply quit or

41

leave Bloomingdale's instead of taking so much leave." (Pl. Opp. 12).  Plaintiff also attempts to draw support for her claim from the fact that that she was fired "only days after presenting a doctor's note recommending that she be afforded another medical leave." (*Id.*).  As explained in greater detail below, the Court again finds that Plaintiff has not met her burden of identifying evidence that would allow a reasonable factfinder to conclude that Defendants took an adverse action against her *because of* her protected activity.

Beginning with Plaintiff's cited deposition testimony, the Court finds that this evidence fails to shed light on the issue of whether Plaintiff was fired because she requested FMLA leave.  The first two comments to which Plaintiff points are (i) Kotsovolos's remark that "if you don't feel good, stay in your home, don't come to work" and (ii) DiFranco's statement that Plaintiff "should stay home, or 'go on disability.'" (Pl. Opp. 12).  Plaintiff does not explain how either of these remarks, both of which appear to support Plaintiff's use of FMLA leave, provides evidence of a retaliatory motive.  Further, Plaintiff again fails to provide a link between these statements and the adverse action that she experienced.  As noted with respect to Plaintiff's retaliation claim under the ADA, all decisions related to Plaintiff's discipline and termination were made by Dito, Morrow, and Watkins-Utsey.  (*See* Def. 56.1 ¶¶ 109, 112, 117).  Plaintiff does not address how these decisions were influenced by or related to Kotsovolos's or DiFranco's statements or alleged animus.[20]

---

[20]    Further, there is no dispute that Kotsovolos never objected to Plaintiff taking a leave of absence or told Plaintiff not to take a leave of absence.  (Pl. 56.1 ¶ 122).

Plaintiff also misplaces her reliance on the June 15, 2017 call she received from someone she believes was Toney.  (*See* Pl. Opp. 12).  To review, Plaintiff testified to receiving a call on June 15, 2017, the day after her hand surgery, from "[s]omebody" in Macy's accommodations office that she believed to be Toney.  (Pl. Dep. 110:18-23).  According to Plaintiff, Toney stated during this call that "we cannot accommodate you anymore.  We did already so many times."  (*Id.* at 110:24-25).  Plaintiff claims that this statement "obviously" demonstrates that Toney was "trying to convince Plaintiff not to take a leave." (Pl. Opp. 12 (internal brackets omitted)).  But while Defendants' alleged failure to accommodate Plaintiff is the subject of her separate failure to accommodate claim under the ADA, it is not probative evidence of FMLA retaliation.  To the contrary, this alleged interaction between Plaintiff and Toney underscores the fact that Plaintiff received leave to undergo the medical treatment from which she was recovering when she answered the phone — something she did four more times after this alleged incident.  (*See* Def. 56.1 ¶ 55).

Plaintiff's temporal argument is also unavailing.  Plaintiff mounts this argument in a brief aside, observing that she was fired three days after submitting a "doctor's note recommending that she be afforded another medical leave" and describing "Defendants' suggestion that there can be no nexus between those two events" as "laughable."  (Pl. Opp. 12-13).  Even assuming that the timing of Plaintiff's termination is sufficient to establish a *prima facie* case of retaliation, such evidence cannot itself overcome Defendants' motion.  The Second Circuit has repeatedly held that "temporal

proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext[.]" *Davies* v. *N.Y.C. Dep't of Educ.*, 563 F. App'x 818, 820-21 (2d Cir. 2014) (summary order) (citing *El Sayed*, 627 F.3d at 933, and *Ben-Levy* v. *Bloomberg, L.P.,* 518 F. App'x 17, 19 (2d Cir. 2013) (summary order)).  Because Plaintiff has not identified any other evidence suggesting that she was terminated or otherwise suffered an adverse employment action because of her protected activity under the FMLA, the Court grants summary judgment to Defendants as to this claim.

## D.  The Court Grants Summary Judgment as to Plaintiff's Claims for Failure to Accommodate Under the ADA and NYSHRL

### 1.  Applicable Law

"The ADA and the NYSHRL require an employer to afford reasonable accommodation of an employee's known disability unless the accommodation would impose an undue hardship on the employer." *Noll* v. *Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting 42 U.S.C. § 12112(b)(5)(A); N.Y. Exec. Law § 296(3)(a)).  "Claims brought under the ADA and NYSHRL for failure to accommodate are analyzed under" the *McDonnell Douglas* burden-shifting framework.  *Berger* v. *N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018) (footnote omitted).  "To maintain a claim under either statute, an employee must show that: "[i] [she] is a person with a disability under the meaning of the ADA; [ii] an employer covered by the statute had notice of [her] disability; [iii] with reasonable accommodation, [the employee] could perform the essential functions of the job at issue; and [iv] the employer has refused to

44

make such accommodations." *Noll*, 787 F.3d at 94 (quoting *McBride* v. *BIC Consumer Prods. Mfg. Co., Inc.,* 583 F.3d 92, 97 (2d Cir. 2009)).

Where, as here, "an employer has taken measures to accommodate an employee's disability, 'the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable.'" *Norman*, 2021 WL 5986999, at *4 (quoting *Noll*, 787 F.3d at 94). "A reasonable accommodation is one that 'enable[s] an individual with a disability who is qualified to perform the essential functions of that position ... [or] to enjoy equal benefits and privileges of employment.'" *Noll*, 787 F.3d at 94 (quoting 29 C.F.R. § 1630.2(o)(1)(ii), (iii)). Of relevance here, a reasonable accommodation "must be 'effective' but need not be 'a perfect accommodation or the very accommodation most strongly preferred' by the individual.'" *Fishman* v. *Off. of Ct. Admin. N.Y. State Cts.*, No. 20-1300, 2021 WL 4434698, at *3 (2d Cir. Sept. 28, 2021) (summary order) (quoting *Noll*, 787 F.3d at 95).

### 2.    Analysis

The parties do not dispute that (i) Plaintiff experienced disabilities within the meaning of the ADA, (ii) Bloomingdale's was aware of those disabilities, and (iii) Plaintiff could perform the essential functions of her job with a reasonable accommodation. (*See* Def. Br. 15 (conceding the first three elements of Plaintiff's *prima facie* case for the purposes of Defendants' motion)). Thus, Plaintiff's claims for failure to accommodate rest upon the issue of whether Bloomingdale's offered Plaintiff reasonable accommodations for her disabilities.

Taking the position that Plaintiff received numerous reasonable accommodations throughout her time at the Store, Defendants catalogue each instance in which Plaintiff applied for, and received, an accommodation. (*See* Def. Br. 15-21). Defendants conclude from this evidence that "[a]ll of Plaintiff's accommodations were granted." (*Id.* at 21). Plaintiff, on the other hand, does not dispute that she was *offered* the accommodations described in Defendants' brief. (*See* Pl. Opp. 14). Rather, she contends that the "major flaw in Defendants' argument is [that] they conflate the nominal bestowal of accommodations on paper and their actual honoring of those accommodations in practice." (*Id.*). Plaintiff goes on to list several instances in which she alleges that Kotsovolos and other coworkers undermined the accommodations Plaintiff had been granted by HR and certain senior managers. (*Id.*).

The Court begins with Plaintiff's claim that she was denied the breaks prescribed by her doctor to address her hand- and spine-related issues. (*See* Pl. Opp. 14). Plaintiff alleges that "while [she] was nominally allowed to take breaks in the employee lounge, Kotsovolos herself pushed Plaintiff to take short breaks, if any; and the employee lounge was a long walk and crowded elevator ride away on a different floor[.]" (*Id.*). She also alleges that "after [her] doctor advised that her spine issues required her to sit for [10] minutes after 50 minutes of standing ... Kotsovolos and others still pressured [her] to keep standing," and, further, that the chair that Defendants provided for her was not near her work station and thus did not allow her to work while seated. (*Id.*).

Plaintiff has not shown that Bloomingdale's denied her a reasonable accommodation with respect to her need for frequent breaks.  At the outset, there is no dispute that Bloomingdale's accommodated Plaintiff's need for such breaks by allowing her to self-monitor her schedule and to take breaks as needed.  (Pl. 56.1 ¶¶ 74, 94, 126).  Plaintiff's claim that this accommodation was denied to her in practice because it was routinely undermined by her coworkers is undercut by the undisputed evidence.  For instance, Plaintiff does not dispute that "[w]hile Kotsovolos might have inadvertently asked Plaintiff to do something when she was thinking of taking a break, it was not intentional, nor was Kotsovolos attempting to interfere with Plaintiff taking her breaks." (Pl. 56.1 ¶ 124).  Relatedly, Plaintiff concedes that she did not tell Kotsovolos or anyone in HR that she was not receiving the breaks she was entitled to receive. (*Id.* at ¶ 76).  Given that Plaintiff was charged with self-monitoring her breaks and does not challenge the reasonableness of that accommodation, the Court cannot find that Plaintiff was denied her breaks where she voluntarily cut them short without informing Kotsovolos or anyone else that she was on break.  The Court does not question Plaintiff's desire to take her breaks or that she may have felt pressured to perform work when asked by her supervisor.  "But if [Plaintiff], whatever her private preferences, always agree[d] to" cut her breaks short, Bloomingdale's "can hardly be held legally responsible for refusing to accommodate her."  *Graham* v. *Macy's, Inc.*, No. 14 Civ 3192 (PAE), 2016 WL

354897, at *5 (S.D.N.Y. Jan. 28, 2016) (dismissing failure to accommodate claim), *aff'd*, 675 F. App'x 81 (2d Cir. 2017) (summary order).[21]

The Court turns next to Plaintiff's claim that she was denied an accommodation for a shoulder injury that prevented her from reaching clothes hung on the top half of clothing racks. (*See* Pl. Opp. 14). Here, again, there is no dispute that Bloomingdale's accommodated Plaintiff by allowing her to "use lower bars to hang garments" and telling her to "ask for assistance from coworkers when clothes were on a high rack[.]" (*Id.*; *see also* Pl. 56.1 ¶ 93). Plaintiff claims, however, that this accommodation was also denied in practice because "her coworkers regularly ignored those restrictions — with little pushback from management beyond a taped up sign." (Pl. Opp. 14). More specifically, Plaintiff testified that "every time when I was out for vacation or sick day and I came back especially 2019 until my termination, [DiFranco] left the garments high." (Pl. Dep. 310:24-311:3). She also testified that, "I asked the people, please can you help me. [Polichetti] one time tell me, do it by yourself. The people was negative to help." (*Id.* at 311:3-6).

Plaintiff has also failed to demonstrate that she was denied a reasonable accommodation with respect to her shoulder injury. To begin, there is no

---

[21]   By the same logic, Plaintiff's claim that she was denied the ability to sit for 10 minutes after each 50 minutes of standing also comes up short. (*See* Pl. Opp. 14). Plaintiff does not dispute that her spine issue was accommodated by allowing her to self-monitor and sit when required. (*See* Def. 56.1 ¶ 102). But Plaintiff argues that this accommodation was ineffective in practice because "Kotsovolos and others still pressured Plaintiff to keep standing[.]" (Pl. Opp. 14). Again, the Court cannot find that Plaintiff was denied an accommodation when she admits that she did not tell Kotsovolos or anyone else who asked her to stand that she was taking a break. (*See* Pl. Dep. 137:21-138:5).

evidence that Bloomingdale's required Plaintiff to lift her arm in a way that was contrary to her doctor's directions.  Nor is there any evidence that DiFranco or Plaintiff's other coworkers placed garments on inaccessible clothing racks while Plaintiff was present in the Store or on routine workdays.  Rather, Plaintiff testified that the only time that she found clothes on the higher racks and was not promptly assisted in retrieving them was upon her return from extended leaves of absence.  (*See, e.g.*, Pl. Dep. 310:24-311:3, 311:22-312:4).  This testimony is consistent with Mirza's email to Plaintiff on June 11, 2019, in which Mirza explained that "when you are out on vacation or on a leave of absence, others need to pick up additional responsibility and complete the work you would normally do.  Clothing may get hung on taller racks during that time because it is the comfortable place for others to hang it."  (Mirza Suppl. Decl., Ex. A at 2).  This evidence demonstrates, at most, that the accommodation Plaintiff received was not perfect.  Undoubtedly, the instances that Plaintiff describes could have been avoided if Bloomingdale's had eliminated the use of higher clothing racks entirely, had informed Plaintiff's coworkers that the garments needed to be placed on the lower rack prior to Plaintiff's return from an extended leave, or mandated that her coworkers assist her immediately any time that she needed clothing from one of the top racks.  But Plaintiff has not shown that the accommodation she in fact received was unreasonable.  *See Payne* v. *Cornell Univ.*, No. 21-109-cv, 2022 WL 453441, at *3 (2d Cir. Feb. 15, 2022) (summary order) (affirming grant of summary judgment as to failure to accommodate claim where plaintiff

49

complained that defendant, "through its employees, failed to allow [plaintiff] to take advantage of the accommodations," reasoning that "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee"); *Miller* v. *Mchugh*, No. 14 Civ. 5026 (CS), 2016 WL 698147, at *5 (S.D.N.Y. Feb. 19, 2016) (dismissing failure to accommodate claim where the plaintiff did not plausibly allege "why or how" the accommodations she received "were not reasonable accommodations").

Lastly, the Court finds that Plaintiff has not demonstrated that Bloomingdale's denied her a reasonable accommodation based on her claim that "[w]hen Plaintiff's doctor changed her restrictions to prohibit forward elevation or rotation of her arm, Kotsovolos continued pushing Plaintiff to do more of the movements that hurt her." (Pl. Opp. 13). Preliminarily, the basis for this claim is difficult to discern because Plaintiff does not include a record citation for it. The Court's own review of the record suggests that Plaintiff is referencing the September 9, 2018 incident in which Kotsovolos instructed Plaintiff to move approximately 200 suits from lower clothing racks to higher ones. (*See* Pl. 56.1 ¶ 144). As discussed earlier, this incident happened prior to Plaintiff alerting Kotsovolos to Plaintiff's medical restriction. (*See* Pl. Dep. 130:3-14 (Plaintiff testifying that she had submitted her physician's note to HR but had not spoken to anyone, including Kotsovolos, about it)). Further, the incident concluded with HR informing Kotsovolos of Plaintiff's medical restriction and directing Plaintiff to return to work. (*See* Def. Reply 56.1 ¶ 144). Plaintiff does not point to a similar incident or otherwise identify an

instance in which she was instructed to perform work that violated her restriction against raising her arm above her head.  The Court cannot find on this record that Bloomingdale's denied Plaintiff a reasonable accommodation.

For all these reasons, Plaintiff has not established a *prima facie* case of failure to accommodate under either the ADA or NYSHRL.  Accordingly, the Court grants Defendants summary judgment as to these claims.

### E.    The Court Grants Summary Judgment as to Plaintiff's Hostile Work Environment Claim Under the ADA

#### 1.    Applicable Law

To prevail on a hostile work environment claim under the ADA, Plaintiff "must show '[i] that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and [ii] that a specific basis exists for imputing the objectionable conduct to the employer.'"  *Fox* v. *Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (quoting *Alfano* v. *Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted)).[22]

"This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  *Hawkins-El* v. *N.Y.C. Transit Auth.*, No. 18 Civ.

---

[22]    Defendants suggest that "the Second Circuit has 'not yet determined whether the ADA provides a basis for a hostile work environment claim.'"  (Def. Br. 22 (quoting *Dollinger* v. *N.Y.S. Ins. Fund*, 726 F. App'x 828, 831 (2d Cir. 2018) (summary order)).  While Defendants accurately characterize the state of the law as of 2018, the Second Circuit has since held "that hostile work environment claims are cognizable under the ADA." *Fox* v. *Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019).

7167 (DLI) (LB), 2021 WL 4222400, at *8 (E.D.N.Y. Sept. 16, 2021) (quoting *Alfano*, 294 F.3d at 374). "Courts look to 'the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'" *Stryker*, 2020 WL 5127461, at *15 (quoting *Fox*, 918 F.3d at 74). "Of course, a plaintiff must also plead facts that show that the conduct created such an environment because of the plaintiff's disability." *Tsatsani* v. *Walmart, Inc.*, No. 19 Civ. 9063 (PAE) (BCM), 2020 WL 6688939, at *11 (S.D.N.Y. Oct. 26, 2020) (quoting *O'Hara* v. *Bd. of Coop. Educ. Servs., S. Westchester*, No. 18 Civ. 8502 (KMK), 2020 WL 1244474, at *14 (S.D.N.Y. Mar. 16, 2020)), *report and recommendation adopted*, No. 19 Civ. 9063 (PAE) (BCM), 2020 WL 6701019 (S.D.N.Y. Nov. 13, 2020).

### 2. Analysis

Plaintiff's hostile work environment claim rests on the same set of alleged comments and actions that have been discussed throughout this Opinion. Specifically, Plaintiff alleges that her coworkers "made multiple comments denigrating her for her disabilities," "purposely placed garments she needed on a high rack so they were inaccessible to [her]," pushed her to complete work rather than take her doctor-prescribed breaks, refused to accommodate her when she was experiencing back pain, commented negatively on her leaves of

absence, and instructed her to place hundreds of suits on a higher clothing rack that she could not reach without experiencing pain.  (Pl. Opp. 15-16).

The Court will consider each of the incidents identified in Plaintiff's brief, but ultimately concludes that none is sufficient, whether considered individually or in the aggregate, to create a hostile work environment within the meaning of the ADA.  To begin, Plaintiff asserts that "multiple employees made multiple comments denigrating her for her disabilities" and that she reported these comments to Kotsovolos "multiple times."  (Pl. Opp. 15 (citing Pl. Dep. 65:12-17, 66:2-13, 67:24-68:10)).  But the cited portions of Plaintiff's deposition testimony reveal far more benign interactions between Plaintiff and her coworkers than her brief would suggest.  Plaintiff testified that Jose Rosario and Sonny Basi, two of her coworkers, "told [her] many times you cannot stay there and don't do tailoring and do only fittings."  (Pl. Dep. 65:15-16).  After Plaintiff explained to Rosario and Basi that the reason she was not doing tailoring was because she had recently had surgery on her hand, "Rosario told [her], you did the surgery because you don't like to do tailoring.  That's why you did the surgery."  (*Id.* at 66:11-13).  Plaintiff further testified that she reported Rosario's and Basi's comments to Kotsovolos, but that she could not remember Kotsovolos's reaction to this news.  (*Id.* at 68:3-6).

While these comments reflect a certain hostility between Plaintiff and her coworkers, they neither amount to "multiple comments denigrating [Plaintiff] for her disability" nor "rise to the level of an objectively hostile workplace." *Williams* v. *Geiger*, 447 F. Supp. 3d 68, 81 (S.D.N.Y. 2020) (quoting *Harvin* v.

*Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order)).  As has often been said in cases addressing comparable comments, "the ADA does not impose a civility code."  *Krist* v. *Kolombos Rest. Inc.*, 688 F.3d 89, 97 (2d Cir. 2012).  The Court has no doubt that Plaintiff did not appreciate the comments made by Rosario and Basi, but the fact remains that rude and dismissive comments of this kind cannot create a hostile work environment.  *See Nugent* v. *St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) (summary order) (concluding that "derogatory language" and "dismissive comments by management" were "insufficiently severe and pervasive" to create a hostile work environment).

Further, Plaintiff has not identified a basis for imputing Rosario's or Basi's alleged comments to Bloomingdale's.  To the contrary, Plaintiff testified that after these comments were made, members of Bloomingdale's HR department convened a meeting with Plaintiff, her manager, and her coworkers and told them that when Plaintiff had an "express fitting," her coworkers "ha[d] to help [her] with the tailoring."  (Pl. Dep. 69:14-18).  *Cf. Fox*, 918 F.3d at 75-76 (finding that plaintiff had satisfied his burden of demonstrating a hostile work environment based on his testimony that defendants mocked his disability over a period of months and within earshot of plaintiff's managers).  Plaintiff does not allege that Rosario, Basi, or anyone else thereafter made similar comments.

Next, Plaintiff claims to have experienced a hostile work environment as a result of her coworkers "purposely plac[ing] garments she needed on a high rack so they were inaccessible to [her], and when she called DiFranco and

others for assistance they either refused or made her wait for hours for help."
(Pl. Opp. 15).  The Court previously discussed this allegation at length in
connection with Plaintiff's claim for failure to accommodate under the ADA,
and will not belabor the point here.  Put simply, Plaintiff has not shown that
her coworkers' use of taller clothing racks while she was on vacation or an
extended leave of absence was sufficiently severe or pervasive to create an
abusive work environment.  Plaintiff has not, for example, alleged or
demonstrated that her coworkers' use of the taller racks on these limited
occasions interfered with her work responsibilities or subjected her to
discipline.  And even if Plaintiff had made such a showing, her claim would still
fall short because she has not come forward with any evidence that her
coworkers placed the garments on the taller clothing racks "because of" her
disability rather than their preference for using the higher racks when possible.
(*See* Mirza Suppl. Decl., Ex. A (explaining this preference to Plaintiff)).  *See also*
*DeAngelo* v. *Maximus/NY Medicaid Choice*, No. 19 Civ. 7957 (CS), 2022 WL
3043665, at *27 (S.D.N.Y. Aug. 2, 2022) (finding that "[a]bsent some evidence
to link [d]efendants' conduct to [p]laintiff's protected characteristics, [p]laintiff
has not raised a triable question of fact on her hostile work environment claim"
(citing *Marseille* v. *Mount Sinai Health Sys., Inc.*, No. 18 Civ. 12136 (VEC), 2021
WL 3475620, at *11 (S.D.N.Y. Aug. 5, 2021)); *Gates* v. *City of New York*, No. 20
Civ. 3186 (JPC), 2021 WL 3774189, at *9 (S.D.N.Y. Aug. 25, 2021) (dismissing
hostile work environment claim brought under the ADA because plaintiff failed
to plead facts suggesting that defendants created a hostile work environment

because of plaintiff's disability); *Zabar* v. *N.Y.C. Dep't of Educ.*, No. 18 Civ. 6657 (PGG), 2020 WL 2423450, at *6 (S.D.N.Y. May 12, 2020) (dismissing hostile work environment claim under the ADA where plaintiff pleaded a "chronology of alleged adverse actions" but failed to plead "facts linking Plaintiff's disability to the alleged adverse actions"); *Cornetta* v. *Town of Highlands*, 434 F. Supp. 3d 171, 187 (S.D.N.Y. 2020) (dismissing hostile work environment claim under the ADA because there were "simply no allegations" that "suggest[ed] that [the defendants] created a hostile work environment *because* of [p]laintiff's purported disability" (emphasis in original)); *De Figueroa* v. *New York*, 403 F. Supp. 3d 133, 161 (E.D.N.Y. 2019) (finding that plaintiff's allegations that defendants yelled at her, asked for her resignation, and gave her additional work responsibilities did not suffice to state a hostile work environment claim under the ADA absent facts "giv[ing] rise to an inference that "Defendants' allegedly hostile conduct was motivated by her disability").

Plaintiff's third purported basis for her hostile work environment claim is her allegation that Toney twice refused to accommodate her disability related to her lower back pain. Preliminarily, the Court notes that it is not clear whether Plaintiff's allegations in this regard can support a hostile work environment (as opposed to a failure to accommodate) claim.[23] Even assuming that Plaintiff's allegations could possibly make out such a claim, however, Plaintiff fatally undercuts her asserted claim by conceding that "Bloomingdale's upper

---

[23]   Curiously, Plaintiff does not raise Toney's alleged denial of the accommodation related to her back pain in connection with her claim for failure to accommodate under the ADA. (*See* Pl. Opp. 14-15).

management and/or Human Resources attempted to accommodate Plaintiff's

physician-prescribed accommodations." (Pl. 56.1 ¶ 103).  As a member of

Macy's Accommodations, Disability and Leave Management office charged with

handling Plaintiff's accommodation requests, Toney undoubtedly falls within

the group of people that Plaintiff believes to have provided her with each of the

accommodations that she requested.  (*See* Def. 56.1 ¶ 15).  Further, Plaintiff's

concession on this point is consistent with the balance of the record evidence,

which shows that Toney did not refuse Plaintiff's requested accommodation but

merely requested additional information from her doctor.  (*See* Toney Suppl.

Decl. ¶ 8; *see also id.*, Ex. C-D).  Plaintiff does not identify anything in the

record that purports to undermine this evidence beyond her conclusory

assertion that Toney denied her a reasonable accommodation.

Plaintiff also claims that she experienced a hostile work environment

because Dito "commented negatively on how many leaves of absence Plaintiff

took to deal with her medical issues." (Pl. Opp. 16 (citing Pl. Dep. 317:25-

318:6)).  Specifically, Plaintiff testified to the following:

> Q.  Did April Dito ever say anything negative to you
> about the fact that you have disabilities or restrictions?
>
> A.  I remember one time in meeting in the HR office she
> mentioning that you have so many leaves of absence.  I
> said, yes, I have them because I went through so many
> surgeries.  The accommodation after the surgeries.  I
> did not take leave of absence for nothing.  Actually I did
> not like this.  I did not take leave of absence to go on
> vacation.  Please.

(Pl. Dep. 317:25-318:12).  As the Court has stated several times, there is no

reason to doubt Plaintiff's representation that she found this exchange to be

unpleasant or disconcerting.  But the testimony cited above is simply not enough to demonstrate that Dito "commented negatively" on her leaves of absence, or to permit her hostile work environment claim to move forward.

Plaintiff's remaining allegations similarly fall short in demonstrating that she experienced a hostile work environment at the Store.  Briefly stated, Plaintiff's allegations related to her inability to take a break do not support her claim because Plaintiff concedes that to the extent that Kotsovolos interrupted her breaks, she did so inadvertently.  (*See* Pl. 56.1 ¶ 124).  Similarly, Plaintiff's attempt to rest her hostile work environment claim on Kotsovolos's instruction to place 200 suits on higher racks is also unavailing.  As noted earlier, Kotsovolos made this request before she was aware of Plaintiff's restriction, and the incident ultimately led to a discussion with HR where Kotsovolos was informed of Plaintiff's accommodation and Plaintiff was told to return to work.  (Pl. Dep. 129:14-24; *id.* at 130:3-14; Pl. 56.1 ¶ 144).  Plaintiff does not allege that a similar incident occurred after these events.  On this record, the Court cannot find that Plaintiff experienced an abusive environment or that there is a causal connection between these alleged incidents and her disabilities.

While the Court finds that none of the incidents cited in Plaintiff's brief is sufficient to show that the purported "harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," *Fox*, 918 F.3d at 74 (internal quotation marks omitted), it is mindful that courts should be careful not to isolate and minimize individual events that, taken together, combine to create an abusive work

environment.  *See Terry* v. *Ashcroft,* 336 F.3d 128, 149 (2d Cir. 2003); *see also*

*Moll* v. *Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (finding that

the district court "should have considered all incidents in their totality" before

dismissing a hostile work environment claim).  Even taking a step back and

considering the incidents described in Plaintiff's brief in their totality, however,

the Court cannot find that Plaintiff has met her burden of showing that she

experienced a hostile work environment within the meaning of the ADA.  The

incidents discussed in Plaintiff's brief are insufficiently severe or pervasive (*e.g.*,

Rosario or Basi's alleged comments); have not been shown to be related to

Plaintiff's disabilities (*e.g.*, her coworkers' use of higher clothing racks); or are

simply belied by the record (*e.g.*, Toney's alleged denial of Plaintiff's request for

an accommodation).  Accordingly, the Court grants Defendants summary

judgment as to Plaintiff's hostile work environment claim.

## F.   The Court Grants Summary Judgment as to Plaintiff's Interference Claims Under the FMLA and NYCHRL

### 1.   FMLA

#### a.   Applicable Law

"FMLA claims come in at least two varieties: interference and retaliation."

*Woods* v. *START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 166 (2d Cir.

2017).  FMLA retaliation claims, which were addressed earlier in this Opinion,

are subject to the *McDonnell Douglas* burden-shifting framework.  *See Hall* v.

*Urb. Assembly, Inc.*, No. 19 Civ. 11572 (JMF), 2022 WL 19708, at *2 (S.D.N.Y.

Jan. 3, 2022).  "By contrast, interference claims are not subject to the burden-

shifting framework." *Id.*  Rather, to establish an FMLA interference claim, "a

plaintiff must demonstrate that: '[i] that she is an eligible employee under the FMLA'; [ii] 'that the defendant is an employer as defined by the FMLA'; [iii] 'that she was entitled to take leave under the FMLA'; [iv] 'that she gave notice to the defendant of her intention to take leave'; and [v] 'that she was denied benefits to which she was entitled under the FMLA.'" *Greenberg*, 838 F. App'x at 605 (quoting *Graziadio* v. *Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016)). "[E]ven when an employee can demonstrate interference with her FMLA rights, the Act 'provides no relief unless the employee has been prejudiced by the violation.'" *Ziccarelli* v. *NYU Hosps. Ctr.*, No. 15 Civ. 9307 (JGK), 2021 WL 797668, at *4 (S.D.N.Y. Feb. 27, 2021) (quoting *Ragsdale* v. *Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

      **b.**    **Analysis**

The parties' briefing in this case focuses on "[t]he fifth element, *i.e.*, that the employee was denied FMLA leave." *Seitz* v. *New York State*, No. 18 Civ. 4149 (PKC) (LB), 2019 WL 4805257, at *10 (E.D.N.Y. Sept. 30, 2019). This element "may be satisfied either by a formal denial or via a 'discouragement theory' of denial." *Id.* Under the discouragement theory of denial, an employer violates the FMLA by "discouraging an employee from using a leave." *Betances* v. *MetroPlus Health Plan, Inc.*, No. 20 Civ. 2967 (JGK), 2021 WL 2853363, at *2 (S.D.N.Y. July 7, 2021). "A plaintiff asserting interference on a discouragement theory must offer evidence of acts of discouragement that 'would have dissuaded a similarly situated employee of ordinary resolve from attempting to

exercise his or her FMLA rights.'" *Id.* (quoting *Reilly* v. *Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009)).

Here, there is no genuine dispute that Plaintiff was never denied any FMLA benefits. As Defendants catalogue in their brief and in their statement of undisputed facts, Plaintiff applied for, and received, six continuous leaves of absence over a three-year period as well as several intermittent leaves. (*See* Def. Br. 25 (citing Def. 56.1 ¶ 55); *see also* Pl. Opp. 13 (conceding this point)). Further, Plaintiff concedes that she has been unable "to articulate any leave of absence she requested and that Bloomin[g]dale's denied." (Pl. 56.1 ¶ 60).

Plaintiff's attempts to ground her FMLA interference claim on a discouragement theory are unavailing. On this score, Plaintiff points first to the fact that when she "sought to go to Greece for her ailing mother[,] [Defendants] refused to allow her to use vacation days and required her to take a leave of absence." (Pl. Opp. 13). The Court fails to see how Plaintiff's receipt of leave can constitute a denial of leave. To be clear, Plaintiff was not denied leave to visit her mother, and did in fact take leave to visit her in Greece. (*See* Def. 56.1 ¶ 59). But Plaintiff contends that she should have been permitted to use her vacation days (as opposed to unpaid leave) for that trip. (Pl. 56.1 ¶ 59). Plaintiff does not, however, identify any provision of the FMLA that would entitle her to use her vacation time to visit her mother, or any shortcoming in the leave she was provided. Because Plaintiff "received all the time she requested and has not otherwise shown that" the leave she received was inadequate under the FMLA, the Court finds that she "has not shown that she

61

was denied a benefit owed to her under the FMLA." *Blodgett*, 828 F. App'x at 5.[24]

Next, Plaintiff argues that Defendants discouraged her from exercising her FMLA rights by making "veiled threats that she ought to simply resign, 'stay home,' or 'go on disability' — or they even told her flat-out that they could no longer accommodate her." (Pl. Opp. 13). While Plaintiff both fails to provide record citations corresponding to these alleged statements and takes certain liberties in summarizing the alleged statements, the Court has searched the parties' statements of undisputed facts for equivalent comments and finds the following: The first comment referenced in Plaintiff's brief appears to correspond to Law's alleged comment in April 2017 that "[i]f you continue to work in the Company, you'll find other medical issues to complain about, from your head to your toes. So you should leave the Company." (Pl. Decl. ¶ 9).

The second comment, which Plaintiff understood to suggest that she go home, appears to correspond to two separate comments made by Kotsovolos and DiFranco. (*See* Pl. Opp. 13). As to the first of these two alleged comments, Plaintiff testified at her deposition that Kotsovolos "told Plaintiff words to the

---

[24] While plaintiffs often allege that defendants violated the FMLA by requiring employees to use their vacation or sick leave instead of FMLA leave, the Court is unaware of any cases addressing the converse claim that Plaintiff mounts in this case. *See, e.g.*, *Amley* v. *Sumitomo Mitsui Banking Corp.*, No. 19 Civ. 3777 (CM) (BCM), 2021 WL 4429784, at *10 (S.D.N.Y. Sept. 27, 2021) (observing that "courts in this Circuit have held that an employee's interference claim fails in circumstances where an employer granted the employee the full amount of time requested as paid 'sick leave' or 'personal leave'"); *Dass* v. *City Univ. of N.Y.*, No. 18 Civ. 11325 (VSB), 2020 WL 1922689, at *9 (S.D.N.Y. Apr. 21, 2020) (explaining that "'[a]n employer may require an employee to exhaust her paid leave prior to requesting FMLA leave,' and the 'employer may elect, or ... require the employee, to substitute any [ ] accrued paid vacation leave, personal leave, family leave, or medical or sick leave of the employee for leave provided [in the FMLA]'").

effect of 'if you don't feel good, stay in your home, don't come to work.'" (Pl. 56.1 ¶ 125 (quoting Pl. Dep. 320:10-17)). And as to the second alleged comment, Plaintiff testified that DiFranco remarked to Plaintiff that "[y]ou did the surgery, you did the therapy, if you are not good, it is better to stop working and stay home. Why come to work? Go on disability!" (*Id.* at ¶ 161 (quoting Pl. Dep. 321:16-19)). The third and final comment referenced in Plaintiff's brief corresponds to the June 16, 2017 call she received from someone she believed to be Toney. (*See* Pl. 56.1 ¶ 141).

The Court cannot find that any of these comments is sufficient to establish a *prima facie* case of FMLA interference. Beginning with Law's and Toney's alleged comments, which were made immediately prior to and following Plaintiff's second hand surgery, the Court finds that these comments would not have "dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Reilly*, 620 F. Supp. 2d at 535. There is no dispute that Plaintiff took a leave of absence in connection with the surgery from June 15, 2017, to July 17, 2017. (*See* Def. 56.1 ¶ 55; *see also* Pl. 56.1 ¶ 55)). Additionally, the record is clear that Plaintiff took additional leaves of absence from (i) April 5, 2018, to May 10, 2018; (ii) February 21, 2019, to March 4, 2019; and (iii) April 6, 2019, to June 10, 2019. (Def. 56.1 ¶ 55).

On this record, Plaintiff cannot demonstrate that Law's or Toney's comments in fact discouraged her from taking leave. *See Hockenjos* v. *Metro. Trans. Auth.*, No. 14 Civ. 1679 (PKC), 2016 WL 2903269, at *9 (S.D.N.Y. May 18, 2016) (finding that the fact that a supervisor "offered plaintiff the

opportunity to take more FMLA leave" after allegedly discouraging him from taking leave on a prior occasion "strongly rebuts plaintiff's allegations" of interference), *aff'd sub nom. Hockenjos* v. *MTA Metro-N. R.R.*, 695 F. App'x 15 (2d Cir. 2017) (summary order); *Stuart* v. *T-Mobile USA, Inc.*, No. 14 Civ. 4252 (JMF), 2015 WL 4760184, at *4 (S.D.N.Y. Aug. 12, 2015) (finding plaintiff failed to demonstrate that she was discouraged from taking FMLA leave where she "conspicuously fail[ed] to identify a single instance in which she delayed or cut short her leave as a result of Defendants' actions"); *see also Majied* v. *N.Y.C. Dep't of Educ.*, No. 16 Civ. 5731 (JMF), 2018 WL 333519, at *3 (S.D.N.Y. Jan. 8, 2018) (dismissing FMLA interference claim where "the record [was] clear that [the plaintiff] received the leave to which she was entitled … under the law").  Further, it is not at all apparent how either Law's or Toney's comment would discourage a similarly situated employee from exercising her rights under the FMLA.  Neither comment addresses FMLA leave whatsoever or suggests that Plaintiff or someone in Plaintiff's situation would be penalized or mistreated for taking leave.  *See Hockenjos*, 2016 WL 2903269, at *9 (finding that "no reasonable jury could conclude" that alleged comments that made no "reference to his FMLA leave whatsoever" could support a discouragement claim); *cf. Macropoulos* v. *Metro. Life Ins. Co.*, No. 15 Civ. 6096 (ER), 2018 WL 1508564, at *13 (S.D.N.Y. Mar. 26, 2018) (observing that FMLA regulations "require an employee to request leave, not just an accommodation").

The Court likewise finds that the comments made by Kotsovolos and DiFranco are insufficient to establish a *prima facie* case of FMLA interference.

Far from discouraging Plaintiff from exercising her FMLA rights, these comments appear to have *encouraged* Plaintiff to take leave under the statute. Plaintiff fails to identify any reason why these comments would dissuade a similarly situated employee from exercising her FMLA rights, and the Court does not perceive one. *See Woolf* v. *Bloomberg L.P.*, No. 16 Civ. 6953 (PKC), 2019 WL 1046656, at *18 (S.D.N.Y. Mar. 5, 2019) (granting summary judgment as to an FMLA interference claim where the employer stated, among other things, "I strongly encourage you to take as much leave time as possible to get better"), *aff'd sub nom. Woolf* v. *Strada*, 949 F.3d 89 (2d Cir. 2020), *and aff'd sub nom. Woolf* v. *Strada*, 792 F. App'x 143 (2d Cir. 2020) (summary order).

Lastly, Plaintiff contends that Defendants interfered with her FMLA benefits when they terminated her on January 16, 2020. (Pl. Opp. 13). This argument is also unavailing because "FMLA 'interference' claims are an *ex ante* remedy to be used where an employer 'has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA.'" *Fitzgerald* v. *We Co.*, No. 20 Civ. 5260 (AT), 2022 WL 952963, at *9 (S.D.N.Y. Mar. 30, 2022) (quoting *Greenberg*, 838 F. App'x at 605). Consistent with the *ex ante* nature of FMLA interference claims, "[s]everal courts in this Circuit have cautioned that claims of this nature should be considered retaliation claims, not interference claims, and must therefore be analyzed under the *McDonnell Douglas* burden shifting framework." *Lievre* v. *JRM Constr. Mgmt., LLC*, No. 17 Civ. 4439 (BCM), 2019 WL 4572777, at *16 (S.D.N.Y. Sept. 20, 2019). Given

its finding that Defendants are entitled to summary judgment as to Plaintiff's

FMLA retaliation claim, the Court does not address the claim further here.

On this record, Plaintiff has failed to demonstrate that she was either

denied or discouraged from taking FMLA leave.  The Court therefore grants

Defendants summary judgment as to Plaintiff's claim for FMLA interference.

### 2.   NYCHRL

#### a.   Applicable Law

The NYCHRL prohibits "any person" from "coerc[ing], intimidat[ing],

threaten[ing] or interfer[ing] with ... any person in the exercise or enjoyment

of ... any right granted or protected" under the NYCHRL, or attempting to do so.

N.Y.C. Admin. Code § 8-107(19).  "In other words, Section 8-107(19) "makes

actionable intimidation, threats or interference with ... a person's exercise or

enjoyment of rights protected under [the NYCHRL]." *Leizerovici* v. *HASC Ctr.,*

*Inc.*, No. 17 Civ. 5774 (BMC), 2018 WL 1115348, at *12 (E.D.N.Y. Feb. 27,

2018) (quoting *Harrison* v. *SUNY Downstate Med. Ctr.*, No. 16 Civ. 1101 (RRM),

2017 WL 4326507, at *6 (E.D.N.Y. Sept. 25, 2017)).  "Threats are required to

state a claim for violation of [Section] 8-107(19)." *Keles* v. *Yearwood*, 254 F.

Supp. 3d 466, 476 (E.D.N.Y. 2017) (quoting *Nieblas-Love* v. *N.Y.C. Hous. Auth.*,

165 F. Supp. 3d 51, 78 (S.D.N.Y. 2016)).  Thus, "[t]o survive a motion for

summary judgment, ... a plaintiff must show that a defendant took some

affirmative step to coerce, intimidate, threaten or interfere when the plaintiff

exercised a protected right." *Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758

(DLC), 2021 WL 930710, at *8 (S.D.N.Y. Mar. 11, 2021).

### b.    Analysis

Defendants move for summary judgment as to this claim on the grounds that Plaintiff has not alleged "threatening action by any of the Defendants." (Def. Br. 34).  In her opposition brief, Plaintiff concedes that she lacks evidence to support her interference claim under the NYCHRL and asks that the claim be dismissed.  (Pl. Opp. 24).  Given Plaintiff's admitted failure to allege that Defendants interfered with her rights under the NYCHRL, the Court grants Defendants summary judgment as to this claim.  *See Rossbach*, 2021 WL 930710, at *8 (granting summary judgment based on similar lack of evidence).

## G.    The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's Remaining State and City Claims

Having granted summary judgment to Defendants as to Plaintiff's federal claims (as well as her failure to accommodate claim under the NYSHRL and her interference claim under the NYCHRL), the Court now considers whether to exercise supplemental jurisdiction over Plaintiff's remaining non-federal claims.

A district court may decline to exercise supplemental jurisdiction where a claim "raises a novel or complex issue of State law" or where the court "has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c).  To determine whether to exercise supplemental jurisdiction over any remaining non-federal claims, courts are to consider the "familiar factors of judicial economy, convenience, fairness, and comity."  *Catzin* v. *Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018) (citing *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under

the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Tortorici* v. *Bus-Tev, LLC*, No. 17 Civ. 7507 (PAC) (KHP), 2021 WL 4177209, at *9 (S.D.N.Y. Sept. 14, 2021).

Here, the Court finds that a balancing of the relevant considerations weighs against exercising supplemental jurisdiction. "Although [Plaintiff's] NYSHRL and NYCHRL claims arise from the same set of facts as her federal claims, 'the legal frameworks under which a court must evaluate the state and city laws at issue diverge, often substantially, from those governing [the federal] claims.'" *Williams* v. *Geiger*, 447 F. Supp. 3d 68, 88 (S.D.N.Y. 2020) (quoting *Hernandez* v. *City of New York*, No. 11 Civ. 6644 (KPF) (DF), 2015 WL 321830, at *25 (S.D.N.Y. Jan. 23, 2015)). For example, while the parties analyze Plaintiff's claims under the NYSHRL using the same legal standards as her federal claims, "the NYSHRL was amended to direct courts to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.'" *McHenry* v. *Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (quoting N.Y. Exec. Law § 300). Plaintiff's state and city claims therefore implicate different and at times uncertain legal frameworks and standards. These considerations weigh strongly against the Court's exercise of supplemental jurisdiction. *See Vargas* v. *St. Luke's-Roosevelt Hosp. Ctr.*, No. 16 Civ. 5733 (JPO), 2020 WL 2836824, at *11 (S.D.N.Y. June 1, 2020)

(collecting cases for this proposition).  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's surviving claims under the NYSHRL and NYCHRL — including for discrimination, retaliation, and hostile work environment — and dismisses these claims without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to Plaintiff's federal claims.  Further, Defendant's motion for summary judgment is also GRANTED as to Plaintiff's claim for failure to accommodate under the NYSHRL and interference under the NYCHRL.  Those claims are dismissed with prejudice.

The Court declines to exercise supplemental jurisdiction over Plaintiff's claims for discrimination, retaliation, and hostile work environment under the NYSHRL and NYCHRL and therefore dismisses those claims without prejudice.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      August 30, 2022
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge

69